**Jerry Lee OSBORN, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 94–684.**

Supreme Court of Iowa.

Feb. 18, 1998.

Rehearing Denied March 18, 1998.

David McCord, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Julie H. Brown, Assistant Attorney General, William E. Davis, County Attorney, and Realff Ottesen, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

HARRIS, Justice.

This appeal from a district court decree denying postconviction relief presents a classic conflict between two basic rights. One is the fundamental constitutional right to a fair trial. Under the facts here a claim that this right was violated is confronted by society's right to finality in criminal prosecutions. We find that the postconviction plaintiff waived his present fair-trial challenge by not raising it during his prior direct appeal. We affirm.

Jerry Lee Osborn, the postconviction plaintiff, was convicted following a bench trial of first-degree kidnapping, attempted murder, and first-degree robbery. His direct appeal from the convictions resulted in an affirmance. *State v. Osborn*, 455 N.W.2d 292 (Iowa App.1990). Osborn was tried jointly with Carl Gordon Ramsey who was convicted of the same offenses, but by a jury. We affirmed Ramsey's convictions in *State v. Ramsey*, 444 N.W.2d 493 (Iowa 1989). Also implicated was Osborn's younger half-brother, Larry Joe McFarland, then fifteen years of age.

Osborn and McFarland had stolen two guns which they had in their possession. They met up with Ramsey and Ramsey's girlfriend, Cristal Jones, with whom they had become acquainted a few days earlier. Osborn and McFarland sold one of the two stolen guns to an acquaintance for fifteen dollars which they used to buy beer and wine coolers for the four.

The extent of Osborn's—as well as McFarland's—participation in what followed is disputed. But under either the State's or Osborn's version, Ramsey later approached a man sitting alone in a pickup truck and asked for a ride to a party at a location out in the country. The man, James Clark, agreed. Ramsey, Osborn, and McFarland got into the truck. Jones however went into a bar and telephoned the police.

When the four reached a rural area Ramsey, using the remaining stolen gun, shot Clark in the head. Clark survived. Ramsey, Osborn, and McFarland proceeded to steal Clark's truck, $200 to $300 in cash, and a checkbook. The three were later apprehended in St. Louis, Missouri, in Clark's truck. Osborn waived his right to a jury trial and his case was tried to the court simultaneously with Ramsey's jury trial.

Osborn presented two witnesses at trial. The first, his mother Donna McFarland, testified that Osborn had a nonviolent character. The second was McFarland who, when called, refused to testify, claiming his constitutional privilege against self-incrimination under the fifth amendment of the United States Constitution.

The next day Osborn's trial attorney, Phil Goedken, alleged to the court the reason McFarland had invoked the privilege was because of prosecutorial intimidation. He asserted an assistant county attorney, Realff Ottesen, threatened to bring charges against McFarland as an adult if he testified on Osborn's behalf. The State denied the accusations and the court overruled the motion, finding it had no factual basis. There was no offer of proof and the trial ended at this point. Osborn's convictions followed.

On direct appeal Osborn assigned only two errors: whether the acts amounted to kidnapping when the victim voluntarily consented to drive the defendant to the country; and whether the kidnapping statute was unconstitutionally vague. Both assignments were rejected. *Osborn*, 455 N.W.2d at 294–95.

As suggested at the postconviction hearing, the State's and Osborn's versions of the events leading up to the shooting differ sharply. McFarland there testified that neither he nor Osborn knew Ramsey was going to shoot the victim or steal his truck. He stated they just wanted a ride to a party. This version was of course in sharp contrast with the prosecution evidence at trial.

According to Cristal Jones' trial testimony, after the fifteen dollar gun sale, while drinking beer and wine coolers, the three men discussed obtaining a ride from someone, shooting them, and taking their car. According to this testimony, Osborn was suggesting this and both Ramsey and McFarland were "going along with it." Jones accompanied the three until Ramsey, Osborn, and McFarland left with Clark. Jones' trial testimony continued:

> DAVIS [the prosecutor]: Did you know what their destination was when they drove away — where they were going?
>
> JONES: Well, they said that they were going to have him drive out by Bettendorf, you know, and then they said something about going out to McCausland after that.
>
> DAVIS: Okay. Did they say what they were going to do after they drove out there?
>
> JONES: They were going to go out to McCausland and then shoot him out there

and then go to Missouri or something, and then they were going to go to California or Florida. They weren't for sure which yet.

> DAVIS: And how long had they been planning that — how many days?
>
> JONES: Well, they didn't plan to shoot him until that day, but before that, they were just going to beat somebody up for about probably three days before that.
>
> DAVIS: When you were back on the porch with the beer and wine coolers and there was a gun, then it was decided that they would shoot him?
>
> JONES: Yeah.
>
> . . . .
>
> DAVIS: Was there a discussion about when he would be shot?
>
> JONES: Yeah, [Osborn] told him not to shoot him until he told him to . . . .
>
> DAVIS: And why did that come up?
>
> JONES: Because [Ramsey] said something about shooting him in the truck, and [Osborn] told him not to because it would make a mess.
>
> . . . .
>
> DAVIS: Now this discussion about actually robbing someone, taking their truck, do you know when that started?
>
> JONES: A few days before it happened.
>
> DAVIS: And there wasn't any talk about shooting someone until suddenly they had the guns?
>
> JONES: Until that day yeah.
>
> DAVIS: And the discussions that you heard, who was doing the talking?
>
> JONES: Mostly [Osborn] was.

After the three left with Clark in his truck, Jones called the police and reported the plan.

 I. Postconviction relief proceedings are actions at law and are reviewed on error. *State v. Blum*, 560 N.W.2d 7, 9 (Iowa 1997). But when the postconviction applicant asserts violations of constitutional safeguards, we make our own evaluation of the totality of the circumstances in a de novo review. *Jones v. State*, 479 N.W.2d 265, 271 (Iowa 1991). We apply the de novo review in claims of ineffective assistance of counsel. *Irving v. State*, 533 N.W.2d 538, 540 (Iowa 1995).

■ We have already mentioned that Osborn raised only two assignments of error in his direct appeal. As will appear, neither of them touched on the grounds on which he posits his postconviction challenge. This presents him with a formidable obstacle. Iowa Code section 822.8 (1997) provides that postconviction relief may not be granted on assignments not asserted in prior applications for relief in the absence of a showing of good cause. Under this provision we have long held postconviction relief is not a means for relitigating claims that were or should have been properly presented on direct appeal. *Earnest v. State,* 508 N.W.2d 630, 632 (Iowa 1993); *Washington v. Scurr,* 304 N.W.2d 231, 235 (Iowa 1981). Thus any claim not properly raised on direct appeal may not be litigated in postconviction unless there is a showing of "sufficient reason" or "cause" for not properly raising it previously, and of actual prejudice resulting from the alleged error. *Jones,* 479 N.W.2d at 271; *Polly v. State,* 355 N.W.2d 849, 856 (Iowa 1984). Ineffective assistance of appellate counsel may provide "sufficient reason" or "cause" to permit the issue of ineffective assistance of trial counsel to be raised for the first time in a proceeding for postconviction relief. *Jones,* 479 N.W.2d at 271; *Collins v. State,* 477 N.W.2d 374, 376 (Iowa 1991).

■ II. The State does not dispute that Osborn had a right to present McFarland as a witness, free from prosecutorial threats. Osborn's position on the point is well taken. The right to present a defense is rooted in the sixth amendment right to compulsory process. *Washington v. Texas,* 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019, 1023 (1967). The right to present a defense is so fundamental and essential to a fair trial that it is accorded the status of an incorporated right in the due process clause of the fourteenth amendment:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023. Since *Washington,* several decisions have rested on the due process clause alone without any mention of the sixth amendment. *See Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam). Our authority is in accord. *State v. Fox,* 491 N.W.2d 527, 531 (Iowa 1992).

■ III. Osborn presents his witness intimidation claim in two ways, both of which are subject to the preservation problem under Code section 822.8. He first argues that section 822.8 is no bar to his claim because he had "sufficient reason" for not raising his claim on his direct appeal. At that time, the argument goes, the record was inadequate to justify raising the point for want of an offer of proof. He asserts that many facts pointed out in the postconviction action were not available to him on direct appeal. But Osborn's trial record was sufficient to alert his appellate counsel to the precise point he now urges. If Osborn's appellate counsel had chosen to urge error on the point, he could have moved for a limited remand under Iowa rule of appellate procedure 12(g) in order to develop a record. We conclude that Osborn has not established sufficient reason why the witness intimidation claim was not raised on direct appeal. The point was therefore waived.

Osborn's fall back position, the second way in which he presents his witness intimidation claim, is by urging that his trial counsel was ineffective for not sufficiently raising and preserving the point. Because this claim was also not raised on direct appeal, Osborn asserts his appellate counsel was ineffective for not pressing the point by challenging trial counsel's effectiveness. We discuss this issue in the divisions that follow.

IV. Osborn claims his trial counsel was ineffective in failing to follow through on the chosen defense strategy which was to show he lacked a culpable mental state sufficient to commit the crime. He suggests three failures. Two of them, failure to "disconnect"

Osborn from Ramsey during the trial process and failing to discredit the testimony of Cristal Jones, will be discussed in division VI, following. In this division we consider his claim that his trial counsel was ineffective for failure to preserve his claim of witness intimidation.

There are two elements to an ineffective-assistance-of-counsel claim. We have phrased the first prong in at least three ways: that counsel failed in an essential duty, *State v. Bugely,* 562 N.W.2d 173, 178 (Iowa 1997); that counsel's conduct fell outside the range of normal competency, *Jones,* 479 N.W.2d at 271; and that counsel's performance was so deficient as to not constitute functioning as "counsel," *Kane v. State,* 436 N.W.2d 624, 627 (Iowa 1989). The ultimate test is whether under the entire record and totality of the circumstances counsel's performance was within the normal range of competency. *Meier v. State,* 337 N.W.2d 204, 206 (Iowa 1983). Improvident trial strategy, miscalculated tactics, or mistakes in judgment do not necessarily amount to ineffective assistance of counsel. *Jones,* 479 N.W.2d at 272. The petitioner must overcome a strong presumption of counsel's competence, and a postconviction applicant has the burden to prove by a preponderance of the evidence that counsel was ineffective. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 694–95 (1984); *Jones,* 479 N.W.2d at 272.

Osborn must also prove the deficient performance was so prejudicial as to deprive him of a fair trial. *Jones,* 479 N.W.2d at 271. "To prove prejudice, the defendant must show there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bugely,* 562 N.W.2d at 178 (quoting *Gering v. State,* 382 N.W.2d 151, 153 (Iowa 1986)). A "'reasonable probability is a probability sufficient to undermine confidence in the outcome' of the defendant's trial." *Id.* (quoting *State v. Kraus,* 397 N.W.2d 671, 673 (Iowa 1986)). Our ultimate concern is with "the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. If the petitioner makes an insufficient showing on either prong of the two-part test, we need not address both components. *Hall v. State,* 360 N.W.2d 836, 838 (Iowa 1985). Appellate counsel's failure to raise issues of claimed ineffectiveness of trial counsel are tested the same as ineffective-assistance-of-trial-counsel claims. *Jasper v. State,* 477 N.W.2d 852, 855 (Iowa 1991).

V. Although the parties focus their arguments on the prejudice aspect of the ineffectiveness claim, we think the appeal can and should rest on the first prong—the level of professional competency on the part of Osborn's original appellate counsel. We think Osborn has not established his original appellate counsel's professional performance fell outside the range of normal competency.

Osborn seems to take the position that there is no middle ground in his challenge to the performance of his original appellate counsel—either there was no waiver of the witness intimidation claim or there was ineffectiveness in failing to preserve it. But it is entirely possible for a point such as the one urged here to be waived—deliberately or otherwise—without implicating ineffectiveness. Waiver and ineffectiveness are weighed by different scales and under different standards. Osborn's appellate counsel's knowledge of the trial counsel's assertion that there had been witness intimidation, we have said, weighs heavily in our finding he has not established sufficient cause for failing to raise it on appeal. It does not however follow that he was ineffective in electing not to assign it as error.

Selecting assignments to assert as grounds for reversal is a professional judgment call we are reluctant to second-guess. We have said:

A heavy professional responsibility devolves upon an appellate lawyer when it comes to assessing possible assignments of error. Of course error is waived if it is not assigned. On the other hand most experienced appellate lawyers or judges will attest it is a tactical blunder, often devastating to an appellant, to assign every conceivable complaint. Highly competent appellate lawyers generally assign only the

strongest points and rely on them for reversal. . . . Hindsight [may show the judgment call] was wrong. But this is a far cry from qualifying as ineffective representation.

*Cuevas v. State,* 415 N.W.2d 630, 633 (Iowa 1987); *see also Jones,* 479 N.W.2d at 272; *Sims v. State,* 295 N.W.2d 420, 424–25 (Iowa 1980). From the present vantage point, and in long retrospect, it can be argued Osborn's appellate counsel might well have raised the point he now seeks to assert, but there were sound reasons for spurning the point at the time. It was—and remains—far from clear that an expanded record would have been fruitful.

Although Osborn disputes the point, we find McFarland exercised his fifth amendment privilege at Osborn's trial on the advice of counsel, a finding that detracts considerably from Osborn's claim of witness intimidation. *See United States v. Simmons,* 699 F.2d 1250, 1252 (D.C.Cir.1983) (no witness intimidation where refusal to testify was on advice of witness's own counsel); *see also State v. Baylor,* 17 Wash.App. 616, 565 P.2d 99, 102 (Ct.App.1977) (same). It is clear that McFarland's lawyer had far sounder grounds for his advice than the prosecutor's improper threats. McFarland had an extensive juvenile court record, having run away from his placement in state homes seven times. He was transported to Osborn's trial from his place of confinement on an unrelated charge at the Iowa state training school for boys at Eldora. When called as a postconviction witness he was confined to a correctional facility on still another unrelated charge. Most of all, appellate counsel knew that, within a few weeks following Osborn's trial, McFarland entered a plea agreement whereby, on the basis of attempted murder of Clark, and first-degree robbery of Clark, McFarland was recommitted to the Eldora training school. Appellate counsel faced the strong likelihood that McFarland's testimony about merely seeking a ride to a party could not have withstood withering cross-examination. And the obvious skepticism concerning McFarland's potential testimony, as weighed by the trial attorney when advising McFarland not to testify, was also a factor to be weighed by McFarland's appellate counsel.

Under these circumstances we find Osborn has failed to show that his appellate counsel was ineffective in waiving, by passing, the point he now urges.

Our familiar principles regarding waiver and preservation of error, though they might well strike the person raising an otherwise valid point as formalistic and harsh, are demanded as a matter of practical necessity. The justice system, both civil and criminal, is structured to seek out the truth in disputes, and all safeguards accorded to parties are intended to help achieve that end. But, because legal and judicial activities are subject to human error, a flawless trial is a rare thing indeed. Given sufficient time and enough chances, Monday morning quarterbacks can regularly spot some glitch in a trial that was not raised in timely fashion. When error is pointed out at trial it can usually be corrected. If error is first spotted at the appellate level it is still important that it be raised at the earliest opportunity. This is because retrials become more difficult and their results less satisfactory with passing time as witnesses scatter and their memories fade. Our preservation rules proceed from society's need for finality in judgment. We are obliged to apply them.

■ VI. Osborn also fails in his other ineffectiveness claims. They assail two trial failures, neither of which was preserved in his direct appeal. The first one alleges trial counsel's ineffectiveness for not "disconnecting" his trial from that of Ramsey's. Osborn's trial counsel did successfully move the court to sever the two trials. It was originally anticipated that attorneys for Osborn and Ramsey would each select a jury, and that both juries would be present in the courtroom. The trial court assured Osborn and Ramsey that, if any evidence were admissible against one but not the other, arrangements would be made for the appropriate jury to be excluded from the courtroom while the evidence was presented.

On the first day of trial Osborn's counsel advised the court that Osborn wished to waive his right to a jury trial. After ascertaining Osborn's waiver was made voluntarily, knowingly, and intelligently, the court

explained it would also be presiding over Ramsey's trial. Any facts not admissible against Osborn would be ignored in the decision regarding Osborn's guilt.

Osborn maintains trial counsel was ineffective in advising him to waive a jury trial and contends he was prejudiced because this arrangement allowed the trial court to hear evidence that was offered solely against Ramsey and that could have prejudiced the court against Osborn. We reject the contention. *See Jasper*, 477 N.W.2d at 857 (court's knowledge of inadmissible evidence did not predicate error when the court states it will not consider such evidence).

Osborn concedes that lack of success does not amount to ineffective assistance of counsel. *Jasper*, 477 N.W.2d at 857; *Kane*, 436 N.W.2d at 629. But he claims a trial attorney must also *follow through* on the chosen strategy to be effective. *See State v. Wilkens*, 346 N.W.2d 16, 19 (Iowa 1984).

We find Goedken's conduct did not fall outside the normal range of competency. Goedken testified the reasons for waiving the jury trial included the nature of the act and the potential for a life sentence. According to Goedken, he and Osborn ultimately concluded that Osborn "might get a fairer shake with a judge rather than a jury." Tactical decisions such as this are immune from subsequent attack by an aggrieved defendant claiming ineffective assistance of counsel. *See Jasper*, 477 N.W.2d at 857; *Kane*, 436 N.W.2d at 627.

Finally Osborn asserts his trial counsel was ineffective for failing to introduce letters which he says the State's witness, Cristal Jones, wrote to codefendant Ramsey, and also for failing to undermine her credibility during cross-examination. At the postconviction hearing Osborn testified he had seen such letters in which she stated that she intended to lie at trial in order to convict both Ramsey and Osborn. There is no other evidence the letters existed or that Goedken could have been able to locate them. It is uncertain how Jones would have responded to the inquiry and whether questioning her about them would have damaged her credibility. Viewing the record in its totality we cannot conclude the trial attorney's conduct fell outside the normal range of competency.

The trial court correctly dismissed Osborn's postconviction claims.

**AFFIRMED.**

All justices concur except CARTER, J., who concurs specially.

CARTER, Justice (specially concurring).

I concur in the result, but base that concurrence on the trial court's finding in the postconviction proceeding, with which I agree, that the reason McFarland did not testify at Osborn's trial was the advice of his counsel concerning his own best interests rather than the actions of the assistant county attorney.