Phouc NGUYEN, Appellee,

v.

STATE of Iowa, Appellant.

No. 04–0223.

Supreme Court of Iowa.

Dec. 23, 2005.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, John P. Sarcone, County Attorney, and George Karnas and Joe Weeg, Assistant County Attorneys, for appellant.

Jeffrey T. Mains of Mains Law Office, P.L.C., Des Moines, for appellee.

CADY, Justice.

In this appeal, we primarily consider whether trial counsel's failure to object to prosecutorial misconduct condemned in *State v. Graves*, 668 N.W.2d 860 (Iowa 2003), resulted in prejudice sufficient to support postconviction relief. The district court granted postconviction relief. It found that questions the prosecutor asked the defendant during cross-examination in a murder case involving the defense theory of mistaken identity, which required the defendant to answer whether specific State's witnesses to the incident were either lying or mistaken, resulted in prejudice and warranted a new trial. We transferred the case to the court of appeals. The court of appeals reversed the district court decision. For the reasons that follow, we agree with the conclusion reached by the court of appeals. We vacate the decision of the court of appeals and reverse the judgment of the district court.

## I. Background Facts and Proceedings

Phuoc Nguyen was charged with first-degree murder after he was arrested for

participating in the drive-by shooting of Monty Thomas on July 15, 1998. The shooting occurred outside a bar on Forest Avenue in Des Moines called The Cloud. Nguyen claimed he was the victim of mistaken identity. The case proceeded to trial. The State called six eyewitnesses to support its claim that Nguyen was present at the scene and participated in the shooting. These witnesses were Elgin Byron, Shawn Duncan, David Gray, Owen Smith, Rodney Martin, and Deb Doherty.

Elgin Byron, a cousin of the shooting victim, identified Nguyen as the driver of the car involved in the shooting. Byron testified that between 8:30 and 8:45 on the evening of the shooting, as the sun was setting, he was at the Drake Liquor Store on Forest Avenue about a block from The Cloud. As he left the store to go to his car, he saw a dark-colored vehicle turn west from Martin Luther King Boulevard onto Forest Avenue and stop in the middle of the street in front of The Cloud. Byron was attracted to the vehicle because its tires "screeched" as it turned the corner. After the car stopped, he heard "a lot of shooting." Byron immediately ran back into the store and told the clerk to call 9–1–1. He then exited the store and observed the dark car speed west on Forest Avenue—toward him—then turn south on 21st Street. The car drove past Byron to turn on 21st Street. He recognized the car from having seen it at the bank where he worked. He also recognized the driver, Nguyen, as a bank customer.

Shawn Duncan testified that he was standing outside The Cloud when the shooting occurred. He could not identify Nguyen, but he testified the shots came from "a four-door Mitsubishi Diamante between a '95 and '97 model." In addition, Duncan identified Thanh Dao, who was a passenger in the car when Nguyen was arrested, as a shooter.

David Gray testified that he came upon a dark-colored car as he was driving east on Forest Avenue on July 15. The car was stopped, facing oncoming traffic, in front of The Cloud. After he stopped his vehicle, he observed the passenger and driver step out of the dark-colored car, fire shots, and return to the car. The car then sped away. Gray wrote down the following information on a brochure he had in his car: "376 ETA," "black guy," "Oriental," "a black car," and "Cougar?" Additionally, Gray identified Thanh Dao as the passenger. Gray initially identified the driver as African–American (Nguyen is Vietnamese). At trial, Gray explained: "[The driver] had black hair and wasn't that much taller than the damn door and he was dark complected, you know, [the event] was happening so fast I assumed he was black, and that's what I wrote down on my brochure."

Owen Smith was also at The Cloud on July 15, 1998. He testified that he saw Nguyen and Dao outside The Cloud shortly before the shooting. Dao indicated he was looking for an ounce of cocaine and ended up walking down the alley with some men to conduct a drug deal. Nguyen waited by the car, talking to Smith. When Dao returned from the alley, he had been beaten, was barefoot and screaming in a foreign language. Nguyen got in the car and drove away, and Dao ran back down the alley. Then Smith went into The Cloud, had a beer, and went back outside. Once outside, he saw a black car pull up with four Asian occupants. He knew "what was getting ready to happen." Smith immediately ran around to the back of The Cloud, as the sounds of a hail of gunshots rang out. He then entered the back door of The Cloud. After the shooting stopped, he saw Monty Thomas, a bar patron, lying on the floor. He had been mortally wounded.

Rodney Martin invoked his privilege against self-incrimination and testified by deposition at the trial.[1] In his deposition, Martin testified that he saw Dao, Nguyen, and another man at The Cloud twenty-five to thirty minutes before the shooting. Dao wanted to buy some drugs, and a man named "T" indicated to Martin that he was going to rob Dao. Dao and "T" went down the alley by The Cloud, while Nguyen stayed in the car, and Martin and his cousin served as lookouts. Martin saw "T" beat Dao, choke him, and take his money. Martin said Nguyen and the third man heard Dao screaming for help and drove off. Martin and his cousin then left the bar, and a short time later, heard gunshots. Martin stated he recognized Nguyen, who was present at the deposition, because they attended the same high school.

Deb Doherty lived in the Drake Park neighborhood, three blocks west of The Cloud. On the evening of July 15, 1998, she and a friend drove to The Cloud following the shooting to observe the commotion. However, crime scene tape had been placed around the area, and they were unable to get near the bar. On the way back to her apartment, they came upon a dark-colored, four-door car parked in the middle of 21st Street. There were no occupants in the car at the time. However, she saw three Asian men appear and enter the car. Doherty wrote her observations on a piece of paper: "Three Asians," "20 + years," "376 ETA," and "Dk. car." She identified the person who entered the back of the car as Thanh Dao. She did not identify Nguyen.

Other evidence presented by the prosecution at trial included the testimony of two Des Moines police officers. Officer Steven Kees arrested Nguyen on July 15. He testified that he pulled Nguyen over in response to a radio dispatch that advised police to be on the lookout for a late-model Mitsubishi, license plate 376 ETA, occupied by Asian males. Kees saw the vehicle at a stop sign at 21st Street and Forest Avenue. He activated his emergency lights, and the car eventually stopped. Kees exited his patrol vehicle with his gun drawn and ordered everyone out of the car. Three Asian males exited: Thanh Dao, who was the backseat passenger; Nguyen, who was the driver; and Hieu Tran. All three were arrested. Nguyen was taken to the police station, questioned, and later released. However, an arrest warrant was issued the next day. Officer Holly Glenn served the warrant and arrested Nguyen at his parents' house on July 16. After Glenn placed Nguyen in her police vehicle, she testified he asked, "Why am I being arrested?" Glenn replied, "You're being arrested for the part you played in last night's homicide." Then, Glenn testified, Nguyen responded that "[a]ll he did was drive the car. 'A cop told me I was being pulled over for a broken taillight, I don't know anything else.'"

Hung Pham was the owner of the black Mitsubishi with the license plate number 376 ETA. He testified Nguyen borrowed the car around the time of the shooting. He also testified that when he obtained possession of the car after it had been impounded following Nguyen's arrest, he observed bullet holes in the trunk.

---

1. Martin's deposition testimony came into evidence under the former testimony exception to the hearsay rule. *See* Iowa R. Evid. 5.804(*b*)(1) (allowing, when declarant is unavailable, admission of former testimony "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination"); *id.* r. 5.804(*a*)(1) (stating declarant is unavailable if he or she refuses to testify, invoking a privilege).

After the State concluded its case in chief at trial, and the court denied Nguyen's motion for directed verdict, Nguyen took the stand in his own defense. He denied any involvement in the shooting and stated he was on his way to Saylorville Lake when he was pulled over by police on July 15. He testified that Officer Kees only told him he was being pulled over for a broken taillight. On cross-examination, the prosecutor questioned Nguyen about the testimony of five of the eyewitnesses produced by the State.

The prosecutor first asked Nguyen if he heard the testimony of Rodney Martin at trial, in which Martin placed Nguyen at the crime scene just prior to the shooting. After Nguyen answered affirmatively, the following exchange took place:

Q. *Is he wrong or is he lying?* A. I'm not saying that he was lying, but I think he was mistaken because I wasn't there.

(Emphasis added.)

The prosecutor then asked Nguyen if he heard Elgin Byron testify at trial that he observed Nguyen drive the vehicle at the time of the shooting. After Nguyen answered affirmatively, the following exchange took place:

Q. *Was Elgin Byron mistaken, or is he lying, about seeing you drive in the car at the scene of the shooting?* A. I did not say that he lie[d], but I am sure that he was mistaken because he saw me earlier driving that car and when he saw that car, he thought I would be the driver of that car.

Q. *So like Rodney Martin, Elgin Byron was mistaken; is that right?* A. Yes.

(Emphasis added.)

The prosecutor then asked Nguyen if he had heard Deb Doherty testify that she saw three men in a dark-colored car, license plate number 376 ETA, after the shooting, one of whom she was able to identify as Thanh Dao. After Nguyen answered affirmatively, the following exchange took place.

Q. *Do you think Deb Doherty was mistaken about seen Thanh Dao in the car?* A. I wouldn't know if she said that she saw him, then he was there, maybe he was.

(Emphasis added.)

The prosecutor then asked Nguyen if he heard Owen Smith testify he saw Nguyen and Dao together just prior to the shooting. After answering in the affirmative, the following exchange took place.

Q. *Is he lying or is he mistaken?* A. I didn't say he was lying, but I am sure that he's mistaken because he said something about a guy wearing the— necklace with something, but I never had anything like that on me.

(Emphasis added.)

The prosecutor then asked Nguyen if he heard David Gray testify about his observations at the time of the shooting and his identification of the license plate number of the vehicle involved in the shooting. After Nguyen answered in the affirmative, the following exchange took place.

Q. *Is Mr. Gray mistaken about what he testified to?* A. I didn't say that he was mistaken, he wrote it down so he must have seen it.

(Emphasis added.) Nguyen's counsel made no objections to any of the questions. In addition to his own testimony, Nguyen produced expert testimony concerning the unreliability of eyewitness identification.

The jury found Nguyen guilty of first-degree murder. Nguyen's counsel did not make a motion for a new trial following the verdict. The court sentenced Nguyen to life in prison.

Nguyen appealed, and we transferred the case to the court of appeals. Nguyen contended:

> (1) the evidence [wa]s insufficient to support his conviction; (2) the district court abused its discretion in limiting the testimony of an expert on eyewitness identification; (3) the district court abused its discretion by allowing evidence of Thanh Dao's attempt to purchase drugs; (4) his Sixth and Fourteenth Amendment rights were violated because he was unable to cross-examine Dao; (5) his Sixth and Fourteenth Amendment rights were violated when a witness's deposition was read to the jury; and (6) he was denied effective assistance of counsel in a number of respects.

*State v. Nguyen,* No. 99–1444, 2002 WL 575746 (Iowa Ct.App. Mar. 13, 2002) (unpublished opinion). Nguyen did not claim error based upon the prosecutor's "were they lying/mistaken" questions on direct appeal. The court of appeals rejected all of Nguyen's arguments, except the ineffective-assistance-of-counsel claim based on the failure to make a motion for a new trial. The court preserved this claim for postconviction proceedings. We denied further review.

Nguyen then filed an application for postconviction relief in district court. He claimed his trial counsel was unconstitutionally ineffective in three ways:

1. Counsel failed to object to the prosecutor's impermissible questioning of Petitioner by confronting him with the testimony of various State witnesses, which intruded into the province of the jury to determine witness credibility;

2. Counsel failed to fully explore Petitioner's proposed testimony before it was given and failed to explain the consequences of Petitioner's decision to testify, which resulted in more harm than good, especially given the serious problems of identification that were present in the State's case in chief.

3. Counsel failed to move for a new trial.

In response to the first assignment of error, the State conceded that it was improper for the prosecutor to ask Nguyen if the eyewitnesses who testified at trial were lying or mistaken in their testimony. However, the State claimed the questions were not prejudicial.

The district court found that Nguyen's counsel was ineffective for failing to object to the prosecutor's questioning. It reversed Nguyen's conviction and ordered a new trial. The court did not rule on any other issues. Accordingly, Nguyen filed a rule 1.904(2) motion. The motion asked the court to rule on his additional claims that counsel was ineffective for allowing him to testify without adequate preparation and for failing to make a motion for a new trial, so he could raise these issues on cross-appeal. The court entered enlarged findings and conclusions. It found that trial counsel was ineffective for failing to move for a new trial, but not for allowing Nguyen to testify.

The State appealed the district court ruling. We transferred the case to the court of appeals. The court of appeals reversed the district court. It concluded Nguyen did not suffer prejudice from counsel's omissions and therefore was not denied the effective assistance of counsel. Nguyen applied for, and we granted, further review.

## II.   Standard of Review

When a postconviction relief "applicant asserts claims of a constitutional nature, our review is de novo." *Ledezma*

*v. State*, 626 N.W.2d 134, 141 (Iowa 2001) (citing *Osborn v. State*, 573 N.W.2d 917, 920 (Iowa 1998)). The basis for relief in this case is the denial of the effective assistance of counsel, in violation of the Sixth Amendment. *See State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005) ("Claims of ineffective assistance of counsel are derived from the Sixth Amendment of the United States Constitution." (Citation omitted.)). Thus, our review is de novo. *Id.* (citing *State v. Oetken*, 613 N.W.2d 679, 683 (Iowa 2000); *State v. Carrillo*, 597 N.W.2d 497, 499 (Iowa 1999); *State v. Mapp*, 585 N.W.2d 746, 747 (Iowa 1998); *Osborn*, 573 N.W.2d at 920).

## III. Preservation of Error

■ "Generally, a claim not raised on direct appeal cannot be raised in a postconviction relief proceeding unless the applicant can demonstrate a sufficient cause or reason for not properly raising the issue previously." *Id.* (citing Iowa Code § 822.8 (1995); *Berryhill v. State*, 603 N.W.2d 243, 245 (Iowa 1999); *Osborn*, 573 N.W.2d at 921; *Washington v. Scurr*, 304 N.W.2d 231, 234 (Iowa 1981)). Nguyen raised two arguments in his application for postconviction relief that he did not raise on direct appeal: (1) trial counsel was ineffective for failing to object to the prosecutor's questions; and (2) trial counsel was ineffective for allowing Nguyen to testify without adequately preparing him.

Nguyen claimed in district court that his failure to raise his postconviction relief claims on direct appeal was excused because appellate counsel was ineffective for failing to raise them. *See Berryhill*, 603 N.W.2d at 245 (stating that generally, "any claim not properly raised on direct appeal may not be litigated in a postconviction relief action unless sufficient reason or cause is shown for not previously raising the claim, and actual prejudice resulted

from the claim of error", but both ineffective assistance of appellate counsel and "factual or legal matters which were excusably unknown at the time of the trial and appeal" are exceptions to the general rule (citations omitted)). In response, the State agreed with Nguyen. Consequently, the issues were properly before the district court, and the State cannot now claim Nguyen failed to preserve error by first raising the issues on direct appeal. *See State v. Tubbs*, 690 N.W.2d 911, 914 (Iowa 2005) (holding the State waived error-preservation issue by failing to point out defendant's failure to preserve error at district court level (citing *DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002))).

## IV. Merits

■ The State claims the district court erred by finding Nguyen was prejudiced and suffered ineffective assistance of counsel warranting a new trial. The district court reached its conclusion based on our decision in *State v. Graves*, 668 N.W.2d at 860.

In *Graves*, we held it was improper for a prosecutor to ask a defendant at trial whether other witnesses were lying in their testimony at trial. *See Graves*, 668 N.W.2d at 873 (citing *State v. Singh*, 259 Conn. 693, 793 A.2d 226, 238–39 (2002)). We explained:

> [Q]uestions that ask a defendant to comment on another witness's veracity invade the province of the jury.... [A]s a general rule, such questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence.

*Id.* at 871 (citation, quotation marks, and additional brackets omitted). We laid down a bright-line rule against such ques-

tions, which was violated in this case when the prosecutor asked Nguyen if the State's eyewitnesses were "lying or mistaken." Nguyen claims his trial counsel rendered ineffective assistance by failing to object to the prosecutor's questions.

■■■ To establish a claim of ineffective assistance of counsel, a defendant must show that (1) counsel failed to perform an essential duty, and (2) prejudice resulted. *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002). The State acknowledges it was improper for the prosecutor to ask the "were they lying or mistaken" questions, but contends Nguyen's counsel did not breach an essential duty by failing to object. We agree the questioning constituted misconduct, but we need not decide if counsel's failure to object constituted a breach of an essential duty if Nguyen cannot show prejudice. *State v. Tejeda*, 677 N.W.2d 744, 754 (Iowa 2004) ("Because proof of both prongs of this test is required, should [a defendant] fail to prove prejudice we need not consider whether his trial counsel failed to perform an essential duty." (citing *Oetken*, 613 N.W.2d at 683)). Therefore, we begin by addressing the prejudice element. *See Ledezma*, 626 N.W.2d at 142 ("If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." (citing *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699 (1984); *State v. Wissing*, 528 N.W.2d 561, 564 (Iowa 1995); *State v. Bumpus*, 459 N.W.2d 619, 627 (Iowa 1990); *Taylor v. State*, 352 N.W.2d 683, 685 (Iowa 1984))). Under this second prong, "the defendant must 'show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Taylor*, 689 N.W.2d 116, 134 (Iowa 2004) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698). To determine if the prejudice

standard has been met, we look to the totality of the evidence, the factual findings that would have been affected by counsel's errors, and whether the effect was pervasive, minimal, or isolated. *Strickland*, 466 U.S. at 695–96, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

We begin our analysis by considering the factual findings that would have been affected by the misconduct. *See id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 698 ("Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways."). To properly consider this factor in this case, we return to *Graves*. The predominant factor supporting prejudice in *Graves* was the pervasive manner in which the error was used to obtain a conviction. *See Graves*, 668 N.W.2d at 883 ("The misconduct ... was the centerpiece of the prosecutor's trial strategy." (Citation omitted.)). The misconduct affected the trial by transforming the issue of contradictory testimony on a critical factual point in the case into an aggressive attack by the prosecutor to portray the defendant as a liar and a person who called another witness—a police officer—a liar, something that could only be done to inflame the jury in deciding the factual dispute. *See id.*

In this case, as in *Graves*, the issue affected by the error pertained to a critical factual point—mistaken identity—not a secondary or inconsequential issue. Yet, it is not enough that the affected issue was a critical factual point. We must examine the manner in which the error would have affected the factual findings to support the conviction. This requires us to examine both the error and the factual findings.

At a trial, a lawyer may properly examine a witness about an event by pointing out the factual differences between the

witness's testimony and the testimony of other witnesses to the same event. *See* John A. Burgess, *Persuasive Cross–Examination,* 59 Am.Jur. Trials 1, § 44 (2004) [hereinafter Burgess] (suggesting focusing on "the inconsistency of the claimed observation with the observations of others or exhibits in the case" when cross-examining an observation witness"); 98 C.J.S. *Witnesses* § 482, at 456 (2002) ("It is proper cross-examination to interrogate a witness as to facts or circumstances inconsistent with, and contradictory of, the witness' testimony, or that of another, or acts or conduct at a variance and inconsistent with what would be natural or probable if the witness' statements were true."); *see also State v. Roth,* 403 N.W.2d 762, 767 (Iowa 1987) ("Ordinarily a party may contradict and discredit an adverse witness by presenting evidence showing the facts were other than as indicated by the testimony of the witness." (citing *State v. Odem,* 322 N.W.2d 43, 45 (Iowa 1982))). The factfinder must resolve such factual differences in reaching a verdict, and it can be helpful to the factfinder to have the factual differences identified or highlighted, whether in questioning or closing argument. Fact-based reasons that might account for disparate testimony by witnesses to the same event are also a proper area of inquiry. *See* Burgess, 59 Am.Jur. Trials § 44 (stating that examiner should inquire into facts that make the claimed observation impossible or inaccurate, intervening events that may have affected the witness's memory, as well as possible interest, prejudice, or bias of the witness). Again, the identification of facts to explain the differences may be helpful to the factfinder in resolving the disputes. However, it is not proper to take the further step of asking one witness if another witness is untruthful, mistaken, or to otherwise ask the witness to comment on the credibility of another witness. This type of examination asks for an im-

proper conclusory opinion. *See* Iowa R. Evid. 5.701 (stating that lay opinions are only admissible if they are helpful to the jury). It is simply irrelevant and in no way helpful to the factfinder. *See People v. Melton,* 44 Cal.3d 713, 244 Cal.Rptr. 867, 750 P.2d 741, 758 (1988) ("[S]uch an opinion has no 'tendency in reason' to disprove the veracity of the statements." (Citation omitted.)); *see also* Iowa R. Evid. 5.401 ("'*Relevant evidence*' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Moreover, as illustrated in *Graves,* it can quickly erode into a personal attack that can inflame jurors and interfere with their factfinding mission.

This discussion helps reveal that witness credibility is the underlying issue normally associated with the type of misconduct identified in *Graves.* Of course, a prosecutor, or any attorney, can generally inquire into the credibility of a witness on cross-examination and refer to that credibility in closing argument. *See* 1 John W. Strong et al., *McCormick on Evidence* § 30, at 114 (5th ed.1999) (noting an objective of cross-examination is "to test the witness's story by exploring its details and implications, in the hope of disclosing inconsistencies or impossibilities"); *see also State v. Thornton,* 498 N.W.2d 670, 676 (Iowa 1993) ("In closing arguments, counsel is allowed some latitude. Counsel may draw conclusions and argue permissible inferences which reasonably flow from the evidence presented." (citing *State v. Phillips,* 226 N.W.2d 16, 19 (Iowa 1975))). Thus, the misconduct, and resulting prejudice, does not occur by raising the issue of credibility of a witness, but by the manner in which it is done. The factfinder must resolve conflicts in the testimony of witnesses if possible, and improper prosecuto-

rial tactics can affect the resolution of this issue, especially when the tactics are severe and pervasive. Yet, just as the line between proper and improper questioning in this area depends on the facts, so does the line between prejudicial and nonprejudicial misconduct. The bright-line rule of *Graves* is not a bright-line rule for prejudice. Accordingly, we turn to consider whether the effect of the misconduct in this case was pervasive enough to undermine confidence in the verdict. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

In *Graves*, the prosecutor not only aggressively cross-examined the defendant with "liar" questions, but told the jury in closing argument that the defendant's testimony called the State's witness—a police officer—a liar, and the prosecutor repeatedly and explicitly called the defendant a liar. *Graves*, 668 N.W.2d at 868. In contrast, the prosecutor in this case did not make any reference to lying in closing argument. He never called Nguyen a liar or implied that Nguyen called any eyewitness a liar. Indeed, in closing, the prosecutor explained:

> [Y]ou should try to reconcile any conflicts that you have about the evidence amongst yourselves and while doing so, you determine what testimony you're going to believe, what testimony you're not going to believe, and the part of what testimony you might have heard from someone that you believe because it fits in, it's consistent and the part you may choose to disbelieve of that witness's testimony because it may be inconsistent or because for some reason you don't, and that's where you begin the process of—filtering through the evidence that you've heard and—and deciding on what the facts are, as you are the judges of the facts. . . .

Thus, the prosecutor did not engage in any name-calling tactics. Rather, he reviewed the evidence and told the jury to decide which evidence it believed. By the time the case reached the jury, the issue was whether the evidence showed the eyewitnesses were mistaken or correct about seeing Nguyen at The Cloud, not whether Nguyen was a bad person because he said these witnesses were mistaken. *See Graves*, 668 N.W.2d at 880 (stating prosecutor's attempt to reduce case to the issue of whether Graves lied or police officer told the truth was improper, diverted the jury's proper focus, and distorted the State's burden of proof). Unlike *Graves*, the issue of lying did not become a central theme, or any theme, in the case.

■ Finally, we must also consider the relative strength or weakness of the totality of the evidence. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

Two witnesses testified that Nguyen was at The Cloud with Thanh Dao before Monty Thomas was shot. Both of these witnesses testified that Nguyen waited by the car while Dao attempted to purchase drugs but was instead beaten and robbed. Another witness, Elgin Byron, identified Nguyen as the driver of the car from which the shots were fired. Another witness identified the car as a black Mitsubishi. Another witness testified that the license plate number of the car involved in the shooting was 376 ETA. Nguyen was pulled over near The Cloud after the shooting driving a black Mitsubishi, license plate number 376 ETA, with bullet holes in the trunk. The owner of the car testified that Nguyen had borrowed the car. When Nguyen was pulled over, Thanh Dao—

whom two witnesses identified as a shooter—was with Nguyen. Further, another witness testified that she saw Thanh Dao and two other Asian men get into the Mitsubishi near The Cloud after the shooting but before Nguyen was pulled over. Finally, the police officer who arrested Nguyen testified that Nguyen admitted to driving the car.

Considering all of the factors, we conclude Nguyen has not met his burden of showing a reasonable probability that the result of the trial would have been different had his attorney objected to the prosecutor's improper questions. *See id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Accordingly, Nguyen has failed to establish a claim of ineffective assistance of counsel. *See id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 (stating that if the defendant makes an insufficient showing on one element, the court need not discuss the other element).

▆▆ The State also claims the district court erred in finding Nguyen's counsel was ineffective in failing to move for a new trial. We agree.

▆▆ The grounds for granting a new trial following a guilty verdict are set forth in Iowa Rule of Criminal Procedure 2.24(2)(*b* ). Nguyen claims that had his attorney made a motion for a new trial, there is a reasonable probability the court would have granted it on the ground that the verdict was contrary to the evidence. *See* Iowa R.Crim. P. 2.24(2)(*b* )(6). We have held that "contrary to the evidence" under this rule "means 'contrary to the weight of the evidence.' " *State v. Ellis,* 578 N.W.2d 655, 659 (Iowa 1998). "The 'weight of the evidence' refers to 'a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.' " *Id.* at 658 (quoting *Tibbs v. Florida,* 457 U.S. 31, 37–38, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652, 658 (1982)). This is a more stringent standard than the sufficiency-of-the-evidence standard. *Id.*

"On a motion for judgment of acquittal, the court is required to approach the evidence from a standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution. If on this basis there is substantial evidence justifying an inference of guilt, the motion for acquittal must be denied.

On a motion for new trial, however, the power of the court is much broader. It may weigh the evidence and consider the credibility of witnesses. If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted.

. . . The motion [for new trial] is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict."

*Id.* at 658–59 (quoting 3 Charles A. Wright, *Federal Practice and Procedure* § 553, at 245–48 (2d ed.1982)) (emphasis added).

We have reviewed the evidence presented in Nguyen's trial. We conclude the evidence does not " 'preponderate heavily against the verdict.' " *Id.* at 659 (citation and emphasis omitted). We therefore find no reasonable probability that the district court would have granted a new trial had Nguyen's counsel made the motion. *See*

*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Thus, Nguyen's second claim of ineffective assistance of counsel fails. *See id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 (stating that if the defendant makes an insufficient showing on one element, the court need not discuss the other element). We need not decide whether counsel's failure to move for a new trial breached an essential duty. *Id.*

### V.  Conclusion

Nguyen failed to establish he was prejudiced by either his counsel's failure to object to the prosecutor's improper questions or his failure to move for a new trial. Accordingly, the district court erred in reversing Nguyen's conviction and ordering a new trial. We vacate the decision of the court of appeals and reverse the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

All justices concur except LAVORATO, C.J., who takes no part.