IN THE SUPREME COURT OF IOWA

 No. 117 / 03-1769

 Filed February 17, 2006

CRAIG BOWMAN,

 Appellant,

vs.

STATE OF IOWA,

 Appellee.

 On review from the Iowa Court of Appeals.

 Appeal from the Iowa District Court for Dubuque County, Robert J.
Curnan, Judge.

 The defendant seeks further review of an adverse decision in the court
of appeals on his postconviction relief action. DECISION OF COURT OF
APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR
RETRIAL.

 Linda Del Gallo, State Appellate Defender, and David Arthur Adams,
Assistant State Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant
Attorney General, Fred H. McCaw, County Attorney, and Ralph Potter,
Assistant County Attorney, for appellee.

WIGGINS, Justice.
 In this case, we must decide if Craig Bowman received ineffective
assistance of counsel during a prior criminal prosecution in which he was
convicted of second-degree kidnapping, terrorism with intent, and assault
while participating in a felony. After reviewing the record and
considering the arguments presented, we conclude Bowman established that he
received ineffective assistance of counsel based on his defense counsel’s
failure to object to the prosecutor’s questions asking Bowman whether the
State’s witnesses fabricated their trial testimony. Accordingly, we vacate
the decision of the court of appeals, reverse the convictions, and remand
the case for retrial.
 I. Background Facts and Proceedings.
 The convictions arise out of a series of events that began late in the
evening of July 29, 1999 and ended in the early morning hours of July 30.
At the time of the events leading to his convictions, Bowman was unemployed
and on disability retirement. When Bowman was nineteen years old, a
motorcycle accident caused his physicians to amputate a portion of his left
leg. The doctors fitted him with a prosthesis for his left leg. During
the next twenty years, he was on and off work, and in 1995 John Deere gave
him a total disability retirement from the company due to the problems he
experienced with his injury.
 On the evening of July 29, Bowman and his then girlfriend, Theresa
Carey, visited a bar in Dubuque and drank beer and mixed drinks. Later
that evening, they drove to a bar called The Circle in East Dubuque,
Illinois. Bowman and Carey had been arguing throughout the evening. They
ordered two drinks at The Circle, but the evidence is inconclusive as to
who drank them. Bowman acknowledged that at the time he and Carey left The
Circle they were both intoxicated. As they were walking to their vehicle,
Bowman asked Carey if she intended to repay Bowman for the money he loaned
her to help pay for her divorce. At this point, Carey shoved Bowman’s head
against a wall causing a large cut on his head. Although Carey testified
she did not remember doing this, Karla Schwaegler and Melissa Dakin, who
witnessed the events outside The Circle, saw Carey push Bowman’s head
against the wall.
 Schwaegler and Dakin then saw Bowman place his hands on Carey’s throat
in an effort to choke her. When that occurred, the two women intervened
seeking to separate Bowman and Carey. At about the same time, two
unidentified men arrived on the scene, threw Bowman to the ground, and beat
him up causing abrasions on his body that were the sources of profuse
bleeding. At the conclusion of the beating, Bowman testified one of the
assailants told him that he had not seen the last of them.
 At this point, Bowman asked Carey to leave with him. She refused.
Carey asked Schwaegler and Dakin, whom she did not know, to retrieve her
purse from Bowman’s vehicle. Schwaegler complied, and Bowman drove away.
Carey, Schwaegler, and Dakin went back into The Circle and ordered drinks.
Schwaegler admitted to having about six drinks that evening. She
acknowledged and Dakin confirmed she had a buzz.
 After awhile, Todd Williams, an acquaintance of Dakin, joined them at
their table. Williams worked that morning until 2:00 a.m. He arrived at
The Circle about 2:30 a.m. He admitted to having three to four drinks at
The Circle. Williams offered to drive Schwaegler, Dakin, and Carey back to
Dubuque to retrieve Carey’s automobile parked in front of Bowman’s
residence. The plan was to have Carey and Dakin wait at a Kmart store
parking lot while Williams and Schwaegler retrieved the car and brought it
to the Kmart.
 In the meantime, Bowman returned home to tend to his injuries. When
he arrived at his house, he retrieved two handguns from the basement
thinking the two assailants from East Dubuque would come to his house and
make good on their threat. Bowman had been bleeding so profusely that
blood saturated his clothes and there were bloodstains throughout his
house. Around 3:40 a.m., Bowman saw somebody lurking around his house.
Williams admits he was in the neighborhood at that time with Schwaegler.
Bowman thought the person he saw was one of the assailants from East
Dubuque. He grabbed a gun and started to the door. At this point, he
heard someone trying to start Carey’s vehicle. Bowman was able to see
Carey was not the driver, and he feared someone was trying to steal her
car. From this point on, the evidence is in dispute.
 Bowman testified upon seeing someone in Carey’s car, he fired a shot
in the air. He then approached the vehicle with the gun at his side and
told the driver, Schwaegler, that two people just assaulted him in East
Dubuque. He also told her he thought someone was there to assault him
again, and then asked her to come inside while he called the police. He
stated she obliged and entered his house voluntarily. He testified while
in the house they drank beer together, smoked cigarettes, and talked about
what happened in East Dubuque. Bowman testified their conversation
convinced him Schwaegler was not involved in the East Dubuque assault. He
further testified that the telephone rang and he left the room to get a
cordless phone. Upon returning to the room, Schwaegler grabbed the phone
and answered it. At this point, Bowman saw the police were outside of his
house. He proceeded to exit the house with his gun in his hand. He
returned to the house, put his gun down, and re-exited the house. The
police tackled him as he exited the second time. As the police tackled
him, he told the officers he was just trying to defend himself.
 Schwaegler testified when she and Williams arrived at Bowman’s house,
Williams stayed in the background of a neighbor’s yard while she entered
Carey’s automobile and started the engine. At this point, both Schwaegler
and Williams heard a gunshot and soon observed Bowman standing nearby
pointing a gun at Carey’s car. Williams retreated to a Motel 6 and caused
the attendant there to call the police. Bowman, who was still bleeding
profusely, approached the vehicle and questioned Schwaegler concerning
Carey’s whereabouts. She testified Bowman threatened to shoot her if she
did not accompany him into his house. Schwaegler entered Bowman’s house
and, at his direction, sat on a stool in the kitchen.
 Schwaegler further testified Bowman continued to question her
concerning Carey’s whereabouts and he accused her of somehow being involved
with the two unidentified men who had roughed him up outside The Circle.
Schwaegler testified that Bowman kept his gun pointed at her and threatened
to kill her several times while she was in his kitchen. Schwaegler
contradicted this statement later in her testimony when she admitted Bowman
left the room for twenty to thirty seconds to get the phone when the police
called. Based on the size and layout of the house, twenty to thirty
seconds would have given her ample time to walk out the door.
 When police officer Eric Schneider arrived at the scene, he observed
Bowman’s front door was open. He testified he saw Bowman walk by the front
door, but did not observe Bowman with a gun in his possession. The
officers confirmed Bowman first exited the house with the gun in his
possession. After the police told him to put the gun down, Bowman walked
back in the house, put the gun on the counter, and immediately exited the
house without using Schwaegler as a hostage or human shield. The officers
also confirmed Bowman’s state of mind when they testified Bowman stated he
was only trying to defend himself as they were tackling him to place him in
handcuffs.
 After the police subdued Bowman, Schneider interviewed Schwaegler and
Williams. As to Schwaegler’s intoxication, Schneider testified he believed
she was intoxicated, but on further questioning, he stated she might also
have been upset because she was crying. Regarding Williams’ intoxication,
Schneider testified he did not have an opportunity to assess Williams’
intoxication when he interviewed him. He further testified:

 I really didn’t spend a lot of time with him. I’ve known Mr.
 Williams slightly to see and so on. I mean, he’s always struck me as
 being, I don’t know, oafish maybe so I wasn’t really looking for a lot
 of intelligence from him on this particular morning.
 The jury convicted Bowman of second-degree kidnapping, terrorism with
intent, and assault while participating in a felony. On direct appeal, our
court of appeals affirmed the convictions. Bowman then filed an
application for postconviction relief. The district court denied the
application. Bowman appealed the denial. The court of appeals affirmed
the denial of his application. We granted Bowman’s application for further
review.
 II. Issue.
 Although Bowman raised numerous issues in his appeal from the district
court’s postconviction ruling, this appeal may be resolved on the basis of
Bowman’s claim that he received ineffective assistance of trial counsel
based on the failure of his defense counsel to object to the prosecutor’s
questions asking Bowman whether the State’s witnesses fabricated their
testimony at trial.
 III. Scope of Review.
 A claim of ineffective assistance of counsel requires a de novo
review because the claim is derived from the Sixth Amendment of the United
States Constitution. State v. Wills, 696 N.W.2d 20, 22 (Iowa 2005). In
order to succeed on a claim of ineffective assistance of counsel, a
defendant must prove (1) counsel failed to perform an essential duty and
(2) prejudice resulted. State v. Artzer, 609 N.W.2d 526, 531 (Iowa 2000).
When “ ‘there is a reasonable probability that, but for the counsel’s
unprofessional errors, the result of the proceeding would have been
different,’ ” prejudice results. State v. Hopkins, 576 N.W.2d 374, 378
(Iowa 1998) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104
S. Ct. 2052, 2068, 80 L. Ed. 2d 674, 698 (1984)).
 IV. Analysis.
 A. Counsel’s failure to perform an essential duty. It is well-
settled law in Iowa that a bright-line rule prohibits the questioning of a
witness on whether another witness is telling the truth. State v. Carey,
709 N.W.2d 547, 557 (Iowa 2006); Nguyen v. State, 707 N.W.2d 317, 323-24
(Iowa 2005); State v. Graves, 668 N.W.2d 860, 873 (Iowa 2003). There are
no exceptions to this rule. See Graves, 668 N.W.2d at 873 (stating
“prosecutors and trial judges will have more guidance in assuring proper
examination of witnesses with a bright-line rule that bars such inquiries
without exception”).
 The prosecutor asked Bowman whether another witness was telling the
truth at least eight different times in his cross-examination of Bowman.
Near the beginning of his cross-examination, the questioning went as
follows:

 Q. Okay. So if it was Todd [Williams], then he obviously
 didn’t tell the truth when he testified that he didn’t come any closer
 than the yard? A. That would be correct. I think a police officer
 said that he told him he was in the corner of my house at one point
 too.
A little later in the cross-examination the following occurred:

 Q. So when [Williams] testified that you brought the gun down
 in the shooter’s position, he just made that all up, didn’t he? A.
 He had to have because I didn’t do it.
Soon after that exchange the following occurred:

 Q. Did you force Karla [Schwaegler] into that house that night?
 A. No, I did not.

 Q. Did she lie when she said you did? A. Obviously she did.

 Q. Did she lie when she said you threatened to kill her five or
 six times? A. Yes, she did.

 Q. Do you remember her going into great detail about this phone
 – or this conversation she alleged you had where she told you she was
 a school teacher and she didn’t want to die this way and please
 promise not to shoot her in the back? Did that ever occur? A. That
 never occurred, and to be honest with you, I didn’t hear or see her
 story until I got out of jail and I was shocked beyond belief at what
 I was reading.

 Q. She just made up that whole elaborate story? A. I’m not
 accusing her of doing anything but it’s on paper and it didn’t happen
 so I’d have to say, yes.
A few questions later the following exchange took place:

 Q. But you’re saying [Schwaegler is] lying about pretty much
 everything else that happened at your house? A. She was – it was a
 totally different situation. She was in East Dubuque. She was at my
 house, so again, I don’t know. I don’t know why she did what she did
 but she did.
Another exchange went as follows:

 Q. So when Karla [Schwaegler] and Missy [Dakin] and Theresa
 [Carey] all said she didn’t want to go with you, that wasn’t the truth
 either? A. All I can say, Mr. Potter, is that I reached my hand out,
 I said, Let’s go, honey, and they wouldn’t – by they, I don’t know who
 they were. It was, like, within a second or two. I wasn’t really
 looking at anybody. I was just kind of in a shock, blank stare
 basically.
Later in Bowman’s cross-examination, the following exchange took place:

 Q. Can you explain why Karla [Schwaegler] said she didn’t even
 get [the car] into gear how it moved? A. No, I can’t explain that.
At the conclusion of Bowman’s cross-examination, the following exchange
took place:

 Q. Okay. In summary, Mr. Bowman, would it be fair to say that
 Karla Schwaegler got up here and told a lot of lies? A. She had to
 have because it didn’t happen that way.
 On redirect examination, Bowman’s trial counsel attempted to
rehabilitate Bowman’s testimony by pursuing the following questions and
answers:

 Q. Mr. Bowman, I know Mr. Potter’s been using the term did
 Karla Schwaegler lie. Is that maybe a bit strong in terms of
 terminology? A. Yes. I’m not accusing her of lying. I just think
 her perception and the mood she was in, the alcohol, she possibly
 didn’t see things, you know, clearly.

 Q. So mistaken would probably be a better word? A. Yeah, much
 better.

 Q. You’re not saying that she’s up here doing something
 intentionally against you or whatever? A. Not whatsoever.
 On his recross-examination of Bowman, the prosecutor continued to ask
Bowman to comment on the credibility of the State’s witnesses. He asked
and Bowman answered as follows:

 Q. So you’re saying that when [Schwaegler] said – well, you’re
 saying that for five or six times when she said you threatened to kill
 her, she was misperceiving the situation, not lying about it? A.
 Maybe in her own mind that’s what she thought she heard, but I can’t
 speak for her mind. I’m sorry.

 Q. And for two or three times she thought you heard – she
 thought she heard you say you’re going to shoot her? A. Yeah, could
 have been 20. I mean, I can’t explain that. That’s beyond my power.

 Q. Are you suggesting she’s delusional? A. I’m not suggesting
 anything. I’m just suggesting that – I’m not suggesting anything.
 I’m just thinking that she’s not clear in her thoughts.

 Q. Let’s put it another way. Is it true or not that you
 pointed a gun at her? A. It’s not true.

 Q. And she said you did it the whole time, so was she telling
 the truth? A. I don’t know how to explain. I don’t want to call her
 a liar because I don’t think she is a liar, but I don’t – what she
 said was not true.

 Q. And the same with Mr. Williams, are you saying he just
 simply misperceived you in a three-pointed – or in a stance, shooter’s
 stance shooting that gun? A. He had to.

 Q. You’ve indicated that maybe she misheard you. How about her
 story that she said she told you about not wanting to get shot in the
 back and wanting to live for something as a school teacher, did she
 make that up? A. I know she didn’t say that. I’m not saying she
 made it up or not. Obviously she did not say that so it came from
 somewhere.
 The prosecutor’s questions asked Bowman to comment on the credibility
of the State’s witnesses. Such questions are improper under our bright-
line rule and Bowman’s trial counsel had a duty to make a proper objection
to these questions. Had counsel done so, the trial court was obligated to
sustain the objection. Consequently, Bowman has established trial counsel
failed to perform an essential duty by failing to object to these
questions.
 B. Prejudice. We have previously addressed the prejudice prong of
the Strickland test in the context of a prosecutor asking a defendant to
comment on the veracity of another witness by asking the defendant whether
the other witness lied on the witness stand. Graves, 668 N.W.2d at 882-83.
 There we said the prejudice prong of the Strickland test

 does not mean a defendant must establish “that counsel’s deficient
 conduct more likely than not altered the outcome in the case.” A
 defendant need only show that the probability of a different result is
 “sufficient to undermine confidence in the outcome.” In determining
 whether this standard has been met, we must consider the totality of
 the evidence, what factual findings would have been affected by
 counsel’s errors, and whether the effect was pervasive or isolated and
 trivial.
Id. (citations omitted). To determine whether the prosecutor’s conduct in
this case was prejudicial under the standard articulated by us in Graves,
we must examine the entire record, not just the prosecutor’s cross-
examination.
 It is apparent from our review of the entire record the jury was
required to determine Bowman’s guilt or innocence by determining whether
they believed the State’s witnesses’ version or Bowman’s version of the
facts. Realizing the crucial role the credibility of the witnesses played
in Bowman’s defense, Bowman’s trial counsel retained two expert witnesses
to testify concerning the ability of a frightened, stressed, fatigued, and
intoxicated person to perceive and recall facts and events. One of
Bowman’s experts testified when confronted with a situation such as
Schwaegler was at the time of this incident, a person thinks she is being
truthful, but in reality, she is being unwittingly inaccurate as to the
events she is recalling.
 The State retained its own expert to refute the testimony of Bowman’s
experts. The State’s expert testified that the type of inaccuracies
referred to by Bowman’s experts only apply to the unimportant details, not
to the type of details Schwaegler relayed to the jury in her testimony.
 Knowing that the verdict would turn on the credibility of the
witnesses, the prosecutor initiated an all-out, name-calling attack on
Bowman’s credibility using an impermissible line of questioning at least
eight different times during his cross-examination. Nevertheless, the
prosecutor did not stop there. In his final argument, the prosecutor
commented:

 Why would Karla [Schwaegler] make up this story? That’s back when he
 was still saying she was lying and not just misperceiving it. And he
 says, Well, she’s a school teacher and she might be embarrassed about
 being in East Dubuque and, you know, Karla Schwaegler is not
 embarrassed by being in East Dubuque. Karla Schwaegler was a
 bartender for a number of years. She’s out with a friend going to a
 dance place and to suggest, as he did, that, gee, that’s probably or
 could be the reason why she’s making up these gigantic fibs is rather
 ludicrous.
At another point in his final argument, he commented:

 Theresa [Carey] – and when we start talking about whether people
 are trying to pile on on Mr. Bowman or whether people are trying to
 lie to get him into trouble, Theresa – the easiest thing for her to
 have said was, yeah, yeah, he had both hands on my throat and I was
 off the ground. She says, I know he’s choking me; I don’t know if my
 feet are off the ground, I just know I can’t breathe.
A third time during his final argument, he commented:

 [Schwaegler] says he threatens to kill her at least five times,
 threatens to shoot her at least two to three times if she did not do
 what he demanded. She is not a liar, ladies and gentlemen of the
 jury, what the Defendant agreed she was before he took a break and
 then decided, well, gee, she’s misperceiving things. She’s not a
 liar. She’s not delusional. And to acquit him on the kidnapping
 charge or the assault while participating in a felony charge, you’re
 going to have to find she’s a liar or delusional.
A fourth time during his final argument, he commented:

 And to acquit him on the terrorism charge, you’re going to have
 to find Todd Williams is a liar and that he made up this whole three-
 point stance story, which I’ve already got into as how he would know
 this guy’s an expert marksman – or a trained marksman, I should say,
 if he just fired the gun in the air.
A fifth time during his final argument, he commented:

 [Schwaegler would] sit there and think for awhile and say, yeah,
 that’s exactly what he said. That would be lying, ladies and
 gentlemen, if she did that. If he didn’t do that then and threaten to
 kill her or do all this, she’s a world class liar or she’s delusional
 and there’s nothing in the facts to support either one of those.
Finally, for a sixth time during his final argument, he commented:

 I must have asked him what, ten, eleven times during the course of my
 first cross-examination is [Schwaegler] lying? And my final question
 was: Did she get up here and tell a pack of lies? Yeah. He takes a
 break and says, whoa, whoa, whoa, it’s misperception, it’s
 misperception. And I still say to you, ladies and gentlemen, if it
 didn’t happen, she’s lying.
 The prosecutor’s all-out, name-calling attack on Bowman’s credibility
shifted the focus of the trial from the real issue—what really happened
based on the admissible evidence in this case. A trial is not a modern day
political campaign where a voter usually makes a decision after being
bombarded by name-calling attack ads. Our criminal justice system requires
a jury to decide a criminal case on a thorough and thoughtful review of the
evidence to determine whether the State proved the defendant’s guilt beyond
a reasonable doubt. The defendant’s guilt is not supposed to be determined
by the jurors answering the simple question of whether the defendant or the
State’s witnesses were lying. By distorting the State’s burden of proof,
the prosecutor took the jury’s focus away from the State’s obligation to
prove the defendant’s guilt beyond a reasonable doubt.
 Finally, the State’s case was not particularly strong. The State
relied on the credibility of witnesses who had been drinking in the hours
before the incident. The experts disagreed on the effect the events of the
evening had on the witnesses’ recollection of the facts. Additionally, the
events leading up to the alleged kidnapping were bizarre and left largely
unexplained. Why did Schwaegler and Dakin not call the police after they
witnessed the initial assault? Why did Schwaegler and Dakin get involved
in a complete stranger’s domestic dispute? Finally, why did Schwaegler and
Dakin enlist the help of a third party to retrieve Carey’s vehicle, rather
than requesting police intervention?
 Instead of presenting the evidence for the jury to consider under the
instructions of the court, the prosecutor chose to engage in an all-out,
name-calling attack. The pervasiveness of the prosecutor’s conduct coupled
with the relative weakness of the State’s case shows there is a reasonable
probability that the result of this case would have been different if
Bowman’s trial counsel had objected to the prosecutor’s questions.
Therefore, our confidence in the outcome of this case is undermined.
Compare Graves, 668 N.W.2d at 883 (finding prejudice where the county
attorney’s misconduct “related to a critical issue in the case and was the
centerpiece of the prosecution’s trial strategy” and the evidence of the
defendant’s guilt was not strong), with Carey, 709 N.W.2d at 558 (finding
no prejudice in asking a witness to comment on the credibility of another
witness on a collateral issue when the State’s case was strong), and
Nguyen, 707 N.W.2d at 326-27 (finding no prejudice in asking a witness to
comment on the credibility of another witness, which did not become a theme
in the case and did not amount to name-calling when the State’s case was
strong).
 Accordingly, Bowman established his ineffective-assistance-of-counsel
claim and is entitled to a new trial.
 V. Disposition.
 Because Bowman established his claim of ineffective assistance of
counsel, we vacate the decision of the court of appeals, reverse the
judgment of the district court, and remand the case for retrial of the
criminal charges in the district court.
 DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED
AND CASE REMANDED FOR RETRIAL.
 All justices concur except Carter, Larson, and Cady, JJ., who
dissent.
 #117/03-1769, Bowman v. State
CARTER, Justice (dissenting).
 I respectfully dissent.
 Prosecutorial misconduct by itself is not a basis for overturning a
criminal conviction. It must be shown that the misconduct denied the
defendant a fair trial. State v. Wilkins, 693 N.W.2d 348, 352 (Iowa 2005).
 This requirement to demonstrate prejudice exists even in those cases in
which error has been preserved at trial. Id.; State v. Piper, 663 N.W.2d
894, 913 (Iowa 2003). When, as here, the issue is raised in the context of
an ineffective-assistance-of-counsel claim, the degree of prejudice that
must be shown is that set forth in Strickland v. Washington, 466 U.S. 668,
694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674, 698 (1984).
 To sustain an ineffective-assistance-of-counsel claim under the
Strickland standard the applicant must show “there is a reasonable
probability that, but for counsel’s unprofessional errors, the result of
the proceeding would have been different.” Strickland, 466 U.S. at 669,
104 S. Ct. at 2068, 80 L. Ed. 2d at 698. We have articulated this standard
in terms of our confidence level with respect to the validity of the
outcome in the face of counsel’s omissions. State v. Graves, 668 N.W.2d
860, 883 (Iowa 2003). In applying this standard, the court of appeals
determined that Bowman had not demonstrated sufficient prejudice to warrant
the granting of relief. I agree with the court of appeals.
 Our opinion in Graves considered the views of some courts that
approved questioning an accused concerning the truthfulness of another
witness’s testimony in those situations in which the contradiction between
the defendant’s testimony and that of the other witness cannot be
attributed to a difference in perception or inaccuracies in memory, but can
only be explained by the conclusion that someone is lying. We rejected
that exception for purposes of determining whether prosecutorial misconduct
has occurred. We recognized, however, that this may be a factor in
determining the extent to which a defendant has been prejudiced by the
improper questioning. Id. at 873.
 In the present case, the contradiction between Bowman’s testimony on
the one hand and that of Karla Schwaegler and Todd Williams on the other
may not in the ordinary course of human experience be attributed to
differences in perception or inaccuracies in memory. The testimony of
Schwaegler and Williams concerned emotionally charged events that would
leave a vivid impression as to whether an abduction at gunpoint occurred or
did not occur, notwithstanding possible misimpressions as to the details of
how it occurred. I am convinced that this is the way in which ordinary
jurors would view the conflict in testimony and that they would
conscientiously consider and reject the possibility that the State’s
witnesses might be lying even if that suggestion had not been presented in
the cross-examination of Bowman and the prosecutor’s final argument.
 Although an investigating officer expressed the opinion that Karla
appeared to be intoxicated when police came on the scene, he believed it
was also possible that her demeanor may have been an emotional reaction to
what had occurred to her. Karla was able to provide a lucid account of the
events that had transpired, and her account was corroborated by Williams.
The possibility that these witnesses’ description of the alleged abduction,
so soon after the event, was an innocent mistake is sufficiently slight
that the prosecutor’s failure to admit that possibility was not something
that would divert the jurors’ focus from the essential components of their
fact-finding mission. I am confident that the prosecutorial misconduct
that occurred when considered within the context of the entire trial did
not result in sufficient prejudice to satisfy the Strickland standard for
granting relief. I would affirm the decision of the court of appeals and
the judgment of the district court.
 Larson and Cady, JJ., join this dissent.