# IN THE COURT OF APPEALS OF IOWA

No. 20-1664
Filed March 30, 2022

**DAVID CLANCY,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Linn County, Paul D. Miller, Judge.

An applicant appeals the denial of his postconviction-relief application.
**AFFIRMED.**

Alfredo Parrish and Clinton Luth of Parrish Kruidenier Dunn Gentry Brown
Bergmann & Messemer L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney
General, for appellee State.

Considered by Schumacher, P.J., Ahlers, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2022).

**SCHUMACHER, Presiding Judge.**

David Clancy appeals the denial of his postconviction-relief (PCR) application. He alleges his trial counsel was ineffective in failing to object to several instances of prosecutorial misconduct, in failing to object to the admissibility of certain evidence, and in failing to pursue alternative defenses. We affirm.

## I.    Background Facts & Proceedings

Clancy and Paul Tillman were acquaintances and spent time together target shooting, fishing, and smoking marijuana. After Clancy loaned Tillman $400, they arranged for Tillman to periodically obtain marijuana for Clancy. Clancy would give Tillman the money necessary for the purchase of the marijuana; Tillman would buy drugs for Clancy.

In late May 2016, Clancy requested that Tillman purchase $300 worth of marijuana for him. Clancy dropped off the money for the purchase at Tillman's place of employment. Tillman indicated he would deliver the marijuana after he got off work that night around 7:00 p.m. Tillman was to deliver the drugs at a location near Clancy's home.

Shortly after the arranged time to drop off the drugs and a lack of appearance by Tillman, Clancy began texting Tillman, asking about his location. Clancy sent a text message to Tillman, "Why are you fucking me around" and "WTF?" Tillman explained that he had to stay late for work. While waiting, Clancy also sent a text to his girlfriend, stating, "I'm pissed" and that Tillman was "playing head games."

Clancy drove to Tillman's house and waited for him to arrive home from work. Gail Maddox, Tillman's girlfriend, was outside on the porch with her two

dogs. She testified[1] that Clancy seemed agitated and upset. Upon learning that Tillman was not at home, Clancy threatened to take Tillman's dogs. Clancy admitted at trial that he planned to take the dogs to motivate Tillman's return. Maddox took the dogs inside; alerted Tillman to what was happening; and, like Clancy, waited for Tillman to arrive home. Tillman sent a text to Clancy, informing him that he would return the money and that Clancy should not "bother [him] again for weed." Tillman returned home soon after. Once Tillman parked his car, Clancy approached the driver side window and Tillman handed Clancy his money.

Following the money exchange, the parties' versions of events part. Tillman testified that Clancy "sucker punched" him in the face after snatching away the money while Tillman was still in the car. Clancy claimed Tillman charged him unprovoked. Both sides agree a scuffle ensued. They also both agree that Tillman did not land any punches on Clancy, although Clancy claims Tillman broke his finger.[2] Maddox yelled at both men to stop fighting and threatened to call the police. The men separated.

Tillman then walked back up to his porch but believed that Clancy was following him. Tillman grabbed a piece of wood that he used for barbequing and turned back, walking toward Clancy. The piece of wood was about two feet long and a few inches in diameter. Clancy fired three shots. One bullet stuck Tillman in the arm. One bullet struck Tillman in his back, knocking him to the ground. The

---

[1] Maddox passed away a week before trial. Her videotaped deposition was played in lieu of in-person testimony.

[2] Clancy did not seek medical treatment for a finger injury until two months after the May 2016 incident.

third bullet struck Tillman's house. As Clancy fled, Maddox threw a piece of wood at his truck while he drove away.

Police arrived at the scene and located a piece of wood a short distance from the street. No weapons were found in the front yard. Officers searched Tillman's residence and found several guns. Officers located a shotgun in a closet in the bedroom, covered by boxes and clothing. None of the weapons in Tillman's residence were loaded. Officers arrested Clancy the next day and discovered a loaded .40-caliber Glock used in the shooting in the center console of his truck.

Clancy was represented by a series of attorneys. His first counsel filed a notice of affirmative defenses, including intoxication, diminished capacity, and self-defense. Clancy's second set of attorneys withdrew the notice of affirmative defenses and filed a new notice—one that only claimed self-defense. Clancy then obtained his third set of attorneys who did not file a new notice of affirmative defenses but relied on the second notice.

Trial commenced in late May 2018. Over twenty witnesses testified, including Clancy. Relying on his affirmative-defense notice, Clancy testified that Tillman yelled that he would get his shotgun and kill Clancy. Clancy testified that in response, he pulled his pistol from his pocket. Clancy testified that after Tillman obtained a shotgun from his porch or front entrance, rather than a piece of wood, Tillman approached Clancy. According to Clancy, Tillman shouldered his shotgun and Clancy then fired his gun three times, striking Tillman. Clancy left the scene, declining to report the shooting because he feared being arrested for the marijuana transaction.

After a five-day jury trial, Clancy was convicted of attempted murder, in violation of Iowa Code sections 707.11(1) and 707.11(2) (2016), and willful injury resulting in serious injury, in violation of section 708.4(1). The jury acquitted Clancy on a third charge of going armed with intent in violation of Iowa Code section 708.8. Clancy filed a motion for a new trial, which was denied. Clancy filed a direct appeal but dismissed the same.

Clancy filed the instant PCR application, his first, on April 17, 2019. Following trial, the district court denied Clancy's entire application. Clancy appeals.

## II. Standard & Scope of Review

"Generally, an appeal from a denial of an application for [PCR] is reviewed for correction of errors at law. However, when the applicant asserts claims of a constitutional nature, our review is de novo." *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (citations and quotations omitted).

An applicant alleging ineffective assistance must demonstrate a breach of duty by counsel and prejudice. *See Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). Both prongs must be established by a preponderance of the evidence. *Id.* "We may affirm the district court's rejection of an ineffective-assistance-of-counsel claim if either element is lacking." *Anfinson v. State*, 758 N.W.2d 496, 499 (Iowa 2008).

To demonstrate a breach of duty, the applicant must show their counsel performed below the standard of a "reasonably competent attorney." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "We start with the presumption that the attorney performed competently and proceed to an individualized fact-based

analysis." *Lamasters*, 821 N.W.2d at 866. "Ineffective assistance is more likely to be established when the alleged actions or inactions of counsel are attributed to a lack of diligence as opposed to the exercise of judgment." *Ledezma*, 626 N.W.2d at 142. "While strategic decisions made after 'thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' strategic decisions made after a 'less than complete investigation' must be based on reasonable professional judgments which support the particular level of investigation conducted." *Id.* at 143 (quoting *Strickland*, 466 U.S. at 690-91). "The real issue is not whether defense counsel's actions were successful, but whether they were 'justifiable.'" *Anfison*, 758 N.W.2d at 501 (citation omitted).

To establish prejudice, the applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694. When an applicant alleges multiple instances of ineffective assistance, we must analyze the claims "individually and cumulatively." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (citing *Schrier v. State*, 347 N.W.2d 657, 667-68 (Iowa 1984)).

## III.    Discussion

Clancy raises several claims on appeal. First, he alleges counsel failed to object to multiple instances of prosecutorial misconduct. In particular, he alleges counsel was ineffective for failing to object when the prosecutor asked Clancy about the credibility of another witness. Clancy further contends his counsel should have objected to the prosecutor's references to his pre-arrest and post-arrest silence. Clancy also asserts his counsel was ineffective for failing to object

on evidentiary grounds to the prosecutor's references to his pre-arrest silence. Finally, he claims counsel was ineffective for failing to adequately investigate and pursue alternative affirmative defenses.

### A. Prosecutorial Misconduct

Clancy alleges several instances of prosecutorial misconduct and a lack of objection by counsel. "In analyzing the [applicant's] ineffective-assistance-of-counsel claim, our first step is to assess whether the record demonstrates, as a matter of law, the existence or absence of a meritorious due process violation." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). This requires a showing of misconduct and prejudice "to such an extent that the [applicant] was denied a fair trial." *Id.* "[I]t is the prejudice resulting from the misconduct, not the misconduct itself, that entitles a[n] [applicant] to a new trial." *Id.* (citation omitted). When examining the prejudice prong, we consider "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Id.* (citations omitted).

If the applicant can establish a meritorious claim, we then consider the well-established two-prong test for ineffective assistance of counsel. *Id.* at 870. Consequently, we consider "whether an attorney performing within the range of normal competency would have made an objection and/or requested a mistrial," and whether "the record permits a determination of the prejudice prong" of ineffective assistance. *Id.*

## 1. Inducing Clancy to Comment on Witness Credibility

Clancy claims the prosecutor impermissibly solicited his opinion on whether other witnesses were lying and his counsel failed to object. "It is well-settled law in Iowa that a bright-line rule prohibits the questioning of a witness on whether another witness is telling the truth." *Bowman v. State*, 710 N.W.2d 200, 204 (Iowa 2006). "There are no exceptions to this rule." *Id.* (citing *Graves*, 668 N.W.2d at 873). Moreover, the prosecutor need not directly ask if a witness is lying—"it is not proper . . . [to ask] one witness if another witness is untruthful, mistaken, or to otherwise ask the witness to comment on the credibility of another witness." *Nguyen v. State*, 707 N.W.2d 317, 325 (Iowa 2005); *see also State v. Carey*, 709 N.W.2d 547, 552 (Iowa 2006) ("In *Graves*, we held that it is misconduct, under any circumstances, for a prosecutor to ask a witness to comment on the veracity of another witness.").

Clancy highlights the exchanges between himself and the prosecutor:

> Q. So when Ms. Maddox saw you punch him when he was in his car, she's mistaken? A. Yes.
> Q. And when Mr. Tillman said that you punched him when he was getting out of his car, he's mistaken? A. Yes.

Another series of questioning followed:

> Q. So besides Ms. Maddox being quick enough to hide this shotgun, you're telling us that you believe Ms. Maddox and Mr. Tillman were clever enough to come up with this idea that he grabbed a piece of wood? A. It surprised me but, yes, I'm—I believe that they made that story up.
> Q. So there was enough time from when Ms. Draper came out and saw your vehicle speed off and Ms. Maddox coming to Mr. Tillman for them to hide a gun, correct? A. (Nodded head).

Q. Is that a yes?  A. Yes.
Q. For them to come up with a story together, correct?
. . . .
Q. And that conveniently there just happened to be a log across the street that matched their story.  That's what you're saying, this is all a convenience?  A. Yes.

In this exchange, we first note that the prosecutor's questions were largely invited by the defense because after the prosecutor asked what happened to the shotgun that Tillman allegedly pointed at Clancy, he responded, "I'm guessing they hid it."  That testimony directly contradicts the testimony of both Maddox and Tillman, inviting a conclusion that they lied.  And the alleged misconduct by the prosecutor was not pervasive nor severe.  The trial spanned roughly five days, and there are only two instances of questioning in the record before us.

Furthermore, much of the questioning is not asking Clancy to comment on witness credibility, but is instead clarifying Clancy's version of events—if he believed a gun was involved but not found at the scene, it must have been moved at some point.  Asking what happened to the shotgun is not inherently asking for Clancy to comment on the credibility of other witnesses.  This more closely resembles the permissible practice of a prosecutor examining "a witness about an event by pointing out the factual differences between the witness's testimony and the testimony of other witnesses to the same event."  *Nguyen*, 707 N.W.2d at 324-25.

Finally, this was not an "all-out, name-calling attack on [the applicant's] credibility [that] shifted the focus of the trial from the real issue—what really happened based on the admissible evidence in [the] case."  *Bowman*, 710 N.W.2d at 207.  And while this questioning by the prosecutor perhaps pushed the

envelope, given the context of the questioning, we do not find that the prosecutor's questioning rose to the level of a due process violation. Even if we were to find the questioning rose to the level of misconduct, we find a lack of prejudice given the length of the exchange. We determine that Clancy was not denied a fair trial based on this questioning.

Clancy also asserts misconduct in the prosecutor's closing argument. For instance, the prosecutor said, "[Clancy] states, though, that his finger . . . got broken during this altercation. . . . And that doesn't—should not pass common sense or reason, why an individual who was already given the money back [would] do anything like that." The prosecutor also pointed out how Clancy claimed Tillman yelled that he would get a gun, but no neighbors heard it, although they did hear Maddox yelling. Finally, Clancy argues that the prosecutor implied Clancy was lying in his version of events:

> And also out of all this, there happened to be a log across the street that did not belong . . . . Ask yourself, which story is supported by the evidence and which story is more credible . . . ?
> Ask yourselves, does this pass common sense and reason that Ms. Maddox had this time to go down, pick up a shotgun, run inside the house—which was described as cluttered and difficult to move in by [an officer]—go to the bedroom, bury it in the closet, stack boxes in front of it, throw clothes in front of it that's seen . . . and then come up with a story that's identical to Mr. Tillman and then conveniently tell this story to a law enforcement officer at the scene separate from Mr. Tillman . . . .

We generally give prosecutors "some latitude during closing argument in analyzing the evidence admitted in the trial." *Graves*, 668 N.W.2d at 874 (quoting *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975)). Prosecutors "may argue the reasonable inferences and conclusions to be drawn from the evidence. A prosecutor may not, however, express his or her personal beliefs." *Id.* (internal

citation omitted). "The key point is that counsel is precluded from using argument to vouch personally as to a defendant's guilt or a witness's credibility." *State v. Williams*, 334 N.W.2d 742, 744 (Iowa 1983); *see also Carey*, 709 N.W.2d at 556 ("[M]isconduct occurs when the prosecutor seeks [to tarnish the defendant's credibility or boost the State's case] through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury.").

In reviewing this closing argument, we find the prosecutor's statements were "legitimate inferences from the evidence." *Graves*, 668 N.W.2d at 875. The prosecutor's statements were largely referencing specific pieces of evidence, such as the state of Tillman's closet where the shotgun Clancy claims Tillman used was found, as well as specific points from other witnesses' testimony. Our supreme court has found that prosecutors can draw "inference[s] from the divergent testimony of" two witnesses. *Id.* This is not a case in which "the prosecutor personally vouched against the credibility of [Clancy's] testimony." *Id.* The prosecutor did not engage in misconduct during the State's closing argument by implying Clancy lied.

### 2. Doyle Violation

Clancy next claims that his counsel was ineffective for failing to object to the prosecutor's reference to his post-arrest silence in closing arguments. The district court found that while the prosecutor did engage in misconduct, Clancy was not prejudiced because it was "a short, one-time statement in a lengthy trial."

The Supreme Court, in *Doyle v. Ohio*, held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving

*Miranda* warnings, violate[s] the Due Process Clause." 426 U.S. 610, 619 (1976). The Court reasoned that because *Miranda* required every arrestee to be advised of their right to remain silent, "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Id.* at 617. Consequently, prosecutors cannot comment on a defendant's post-*Miranda* silence. *See id.* We note that it is unclear from the record before us if Clancy was Mirandized. *See Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (finding that it does not violate due process to cross-examine a defendant on their post-arrest silence when the defendant was not Mirandized); *see also State v. Johnson*, No. 07-1298, 2008 WL 2906516, at *2 (Iowa Ct. App. July 30, 2008) ("*Doyle* therefore does not protect all silence, but only that 'where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him.'" (citation omitted)). However, because Clancy's claim fails whether he was Mirandized or not, we address the merits of his claim.

The prosecutor referenced Clancy's post-arrest silence in closing argument. The two sentences that contain the challenged reference are as follows: "Two years and one day goes by [from the shooting] and never once did he ever call 9-1-1. After Mr. Tillman testified, Ms. Maddox testified, and all the evidence was presented, we finally get to hear Mr. Clancy's side." Both parties and the PCR court agreed during the PCR trial that this statement was a *Doyle* violation.[3] The district court found a lack of prejudice. We agree. Even if a successful objection

---

[3] On appeal, the State challenges whether these two sentences actually constitute a *Doyle* violation, but as the parties stipulated to the same during trial, we find this argument is not preserved for appeal.

had been made by counsel, Clancy cannot prove the result of the trial would have been different. In addition to Tillman's testimony, medical evidence established that Tillman was shot in the back. Two additional witnesses testified they did not hear Tillman threaten Clancy. No weapon was located at the scene. And Clancy's own expert testified that Tillman was retreating when he was shot. The prosecutor's comment was an isolated incident—two sentences out of five days of trial. Given the evidence against him, it is unlikely the outcome would have been any different had trial counsel objected to the limited statement concerning Clancy's silence. *See Elken v. State*, No. 12-0933, 2013 WL 3864588, at *2 (Iowa Ct. App. July 24, 2013). Thus, Clancy did not suffer prejudice sufficient to change the outcome of the trial.

### 3. Pre-arrest Silence

Clancy contends his attorney was ineffective in failing to object to the prosecutor's discussion of his pre-arrest, pre-*Miranda* silence. In particular, he argues the prosecutor should not have discussed his failure to call the police following the shooting. Our review of the record reveals that the prosecutor discussed Clancy's failure to call the police two times during trial. First, the prosecutor questioned Clancy's girlfriend if Clancy called the police either the night of the shooting or the next morning. Additionally, during closing arguments, the prosecutor discussed how Clancy had "at least 45 minutes from Mr. Tillman's house to his home to gather his thoughts and to call 9-1-1," as well as additional time the next morning.

The district court found the State's questions and comments about Clancy's failure to contact police pre-arrest were not a due process violation. We agree.

First, the Supreme Court is clear that "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). Clancy took the stand and testified in his own defense. Thus, the prosecutor's comments in closing argument were a legitimate way to challenge Clancy's credibility. We do not find a due process violation.

We next turn to the questioning of Clancy's girlfriend concerning his pre-arrest silence. Prosecutors can impeach a defendant with their pre-arrest silence. The "impeachment follows the defendant's own decision to cast aside his cloak of silence" and testify. *Id.* Here, the prosecutor asked Miller about Clancy's failure to call the police prior to Clancy's testimony. While the questions were not posed directly to Clancy, our case law is clear that "the Fifth Amendment can be violated even when the government does not directly coerce testimony from the defendant." *State v. Gibbs*, 941 N.W.2d 888, 894 (Iowa 2020). The Fifth Amendment "generally protects the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Id.* (quotation and citation omitted).

Even if the prosecutor's questions to Miller were misconduct, they did not result in prejudice to Clancy. First, the exchange was limited to two questions—whether Clancy called the police the night of the shooting or the following morning. As such, the misconduct was not pervasive nor severe. Moreover, Clancy's counsel testified at the PCR hearing that they were planning to call Clancy to testify all along and planned to discuss his pre-arrest silence. Consequently, the prosecutor's questions did not compel Clancy to testify. Clancy's counsel was not

ineffective for failing to object. We also note that even assuming counsel could have successfully objected, their decision not to object was a reasonable strategic choice. *See Fryer v. State*, 325 N.W.2d 400, 414 (Iowa 1982). Counsel testified that they planned to discuss Clancy's pre-arrest silence even prior to trial, and thought they had sufficiently explained the issue to the jury so that an objection was unnecessary. We find no due process violation. And we further conclude a lack of prejudice that precluded a fair trial if the claim was analyzed under *Strickland*.

### B.    Evidentiary Issues

Clancy also reframes his argument regarding pre-arrest silence on alternative grounds. He alleges his counsel should have objected to the introduction of evidence related to his pre-arrest silence on evidentiary grounds. In particular, he contends the testimony related to his decision not to contact the police violated Iowa Rules of Evidence 5.403 and 5.404.

As a preliminary matter, we note that Clancy failed to preserve his claim as it relates to rule 5.404. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Clancy did not raise the claim in his PCR application and the district court did not rule on it. As such, our review is limited to his claims concerning rule 5.403.

Clancy contends rule 5.403 required his counsel to object to the admissibility of his pre-arrest silence. Under rule 5.403, "[e]ven relevant evidence can be inadmissible if the evidence's probative value is '*substantially* outweighed by the danger of one or more of the following: unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence.'" *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020) (quoting Iowa R. Evid. 5.403). We analyze an objection under rule 5.403 under a two-part test. *Id.* "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." *Id.* (quoting *State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015)). "[A]ll powerful evidence is prejudicial to one side. The key is whether the danger of unfair prejudice substantially outweighs the evidence's probative value." *Id.* (quoting *State v. Neiderbach*, 837 N.W.2d 180, 202 (Iowa 2013)).

Our courts have long held that pre-arrest silence can be probative evidence when the defendant claims they acted in self-defense. *See State v. Shanahan*, 712 N.W.2d 121, 138 (Iowa 2006) (finding such evidence was "strong, essential evidence" to refute the defendant's version of events); *see also Jenkins*, 447 U.S. at 239 ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted."). Clancy's failure to report his use of deadly force to the police speaks to his intent and how he perceived the situation. *See Shanahan*, 712 N.W.2d at 138 ("When a person is required to use deadly force to protect himself or herself, normally the first course of action is for that person to notify the authorities and report the incident.").

Clancy alleges the evidence is prejudicial because it makes him seem to have a "criminal character" and implies he is "inherently violent or untrustworthy." However, the evidence was not of the sort that our court has traditionally considered unfairly prejudicial. *See Webster*, 865 N.W.2d at 244 (concluding

evidence the defendant had previously struck a pregnant woman was unfairly prejudicial because it would needlessly emphasize the defendant's violent history to a victim the jury would foreseeably be sensitive to); *State v. Huston*, 825 N.W.2d 531, 539 (Iowa 2013) ("Telling the jury the [Department of Human Services (DHS)] determined the child abuse complaint against [the defendant] was founded was unfairly prejudicial due to the risk the jury would substitute the DHS determination for its own finding of guilt or would give the determination undue weight."); *State v. Henderson*, 696 N.W.2d 5, 11-12 (Iowa 2005) (finding evidence of prior drug conviction was unfairly prejudicial in case for "essentially the same crime[]").  The evidence did not confuse or mislead the jury by creating an issue apart from Clancy's guilt or innocence.  *See State v. Buman*, 955 N.W.2d 215, 221 (Iowa 2021) (finding language in an exhibit defining professional standards for nurses confused the jury on the applicable legal standard at trial).

Clancy argues we should analogize this case to *State v. Wilson*, 878 N.W.2d 203, 211-14 (Iowa 2016), which examined the admissibility of evidence that the defendant fled a crime scene.  In that case, the court found four inferences were necessary to impute guilt: "(1) from the defendant's behavior to avoidance of apprehension,  (2) from avoidance of apprehension to consciousness of guilt, (3) from consciousness of guilt to consciousness of guilt concerning the crime charged, and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  *Id.* at 212-13.  Clancy argues the inferential chain breaks down at the third inference because he felt unable to call the police due to the drug transaction that started the confrontation.  Even if true, rule 5.403 requires the probative value be *substantially* outweighed by the unfair prejudice to

the defendant. We determine there was not a breach of an essential duty by trial counsel, as the evidence was admissible and the probative value was not substantially outweighed by any unfair prejudice to Clancy.

## C.    Alternative Defenses

Clancy argues his counsel was ineffective for failing to investigate and pursue the affirmative defenses of diminished capacity and intoxication. Counsel generally has a duty to investigate the case. *See Strickland*, 466 U.S. at 690. "[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention . . . ." *Anfinson*, 758 N.W.2d at 501 (quoting *Ledezma*, 626 N.W.2d at 143). "While strategic decisions made after 'thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' strategic decisions made after a 'less than complete investigation' must be based on reasonable professional judgments which support the particular level of investigation conducted." *Ledezma*, 626 N.W.2d at 143 (citation omitted).

Clancy contends his counsel should have more thoroughly investigated and pursued the diminished-capacity and intoxication defenses based on his lengthy history of mental illness and the potential effects of his medication. Counsel admitted to not reviewing the mental-health records for the time period that would have occurred after the May 2016 shooting. Counsel testified that even if they had reviewed the records, it probably would not have changed their determination to pursue only a self-defense argument.

Clancy claims this case is analogous to *Anfinson*. In that case, our supreme court found that counsel's utter refusal to investigate evidence that his client was suffering from post-partum depression constituted ineffective assistance. *Anfinson*, 758 N.W.2d at 499. Such an analogy on these facts is misplaced. In *Anfinson*, trial counsel categorically refused to consider any evidence that his client suffered from post-partum depression, including failing to obtain medical records indicating his client suffered from depression in the past, publicly stating depression did not play a role, and denying family members' requests to look into the issue. *Id.* at 499-501.

Here, counsel did not categorically refuse to consider alternative defenses despite evidence suggesting the defenses could be legitimate. Rather, trial counsel testified that Clancy gave no indications of mental illness or intoxication throughout their interactions with him. Clancy consistently offered the same version of events with a solid grasp of details. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."). Furthermore, *Anfinson*'s counsel refused to examine medical records; Clancy's counsel examined years of medical records and was aware Clancy had diagnoses of bipolar and manic-depressive disorders from their review of those records. We also note that Clancy was adamant to counsel that his mental illnesses did not play a role. *See id.* ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . And when a defendant has given counsel reason to believe that

pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not be later challenged as unreasonable.").

Additionally, choosing one defense over another was a reasonable strategic decision. Counsel testified that they believed presenting the defenses of diminished capacity and intoxication would undercut their self-defense argument because the only person testifying to Clancy's version of events was himself. Simultaneously claiming that Clancy accurately perceived Tillman raising a firearm while also claiming that he was intoxicated and could not form a specific intent or accurately perceive his surroundings would undercut both claims. Further, Clancy's defense attempted to bolster Clancy's credibility regarding his self-defense claim by discussing his lengthy employment history and knowledge of guns. Such would be undercut by a diminished-capacity affirmative defense. Focusing on self-defense was not a breach of duty. *See State v. Wilkens*, 346 N.W.2d 16, 18-19 (Iowa 1984) (finding counsel was not ineffective for focusing on self-defense rather than diminished capacity because the defense "would be heavily dependent upon the jury accepting [the] defendant's own testimony").

### D. Cumulative Effect

Clancy contends the cumulative effect of the above-discussed claims resulted in constitutional prejudice. *See Clay*, 824 N.W.2d at 501("Iowa recognizes the cumulative effect of ineffective assistance of counsel claims when analyzing prejudice under *Strickland*."). Where, as here, an applicant asserts multiple claims of ineffective assistance of counsel, "the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland*. *Id.* The court should look at the cumulative effect of the prejudice arising from all the

claims." *Id.* Where the applicant raised multiple claims of ineffective assistance and the court found the attorney did not fail to perform an essential duty, that claim is dismissed. *See id.* If the court only considered the prejudice prong, "the court can only dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice." *Id.* at 501–02.

Our supreme court analyzed the cumulative effect of the prejudice prong in *Schrier*, 347 N.W.2d at 668. Our supreme court summarized *Schrier* as follows:

> In *Schrier*, a jury convicted Schrier of first-degree sexual assault and first-degree murder in the abuse and death of his two-year-old son. Schrier appealed the denial of his [PCR] application in which he raised twelve claims of ineffective assistance of counsel. We analyzed six of those claims under the essential duty prong. We assessed the remaining claims under the prejudice prong. We considered some claims, however, for both breach of an essential duty and prejudice. Nonetheless, we analyzed all claims "individually and cumulatively," concluding defense counsel was effective, and Schrier received a fair trial.

*Clay*, 824 N.W.2d at 500 (internal citations omitted).

We have individually analyzed and disposed of one of Clancy's claims under the prejudice prong–counsel's failure to object to the prosecutor's two sentences in his closing arguments concerning Clancy's post-arrest silence. We analyzed a second claim under both the breach and prejudice prong–counsel's failure to object to the prosecutor's cross-examination of Clancy's girlfriend concerning Clancy's pre-arrest silence. Analyzing the two claims together, we determine the cumulative effect did not deny Clancy a fair trial.

## IV. Conclusion

We have considered all issues and claims presented on appeal and find no basis for reversing the judgment of the PCR court that denied relief to Clancy. In

making this determination, we have reviewed the effect of the various claims both individually and cumulatively and find that Clancy has not established that he was denied a fair trial. We affirm the dismissal of Clancy's application.

**AFFIRMED.**