# IN THE COURT OF APPEALS OF IOWA

No. 23-0991
Filed June 5, 2024

**JASON SHIMAR KEYS,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Chris Foy,

Judge.

An applicant appeals the denial of his application for postconviction relief.

**AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee State.

Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

This is the third time we have taken up Jason Keys's case on appeal. *See generally State v. Keys* (*Keys I*), No. 15-1991, 2017 WL 1735617 (Iowa Ct. App. May 3, 2017) (direct appeal); *State v. Keys* (*Keys II*), No. 17-1556, 2018 WL 4382063 (Iowa Ct. App. Sept. 12, 2018) (appeal from ruling on remand from direct appeal). Keys now asks that we find his trial attorney provided ineffective assistance related to several evidentiary matters that were addressed during his trial, including prosecutorial misconduct, and argues that overall there was cumulative error that resulted in *Strickland* prejudice.[1] We affirm the PCR court.

We summarized some of the relevant background facts in *Keys I*:

> On December 4, 2014, a confidential informant, Jonathan Hjelle, notified Frank Hodak, Sheriff's Deputy and North Central Iowa Drug Task Force investigator, that he could purchase one gram of methamphetamine from . . . Keys later that day. Hodak then assembled other members of the task force to conduct a controlled buy.
> . . . Hjelle then contacted Keys through text messages to confirm the transaction. Hjelle testified that he walked to the house where Keys was located and met Keys in the back bedroom. He stated that he sat down, handed Keys the money, and after Keys commented on an older, crisp fifty-dollar bill, Keys handed the methamphetamine to him. . . .
> After the purchase, Keys and Hjelle went outside to meet two individuals in a truck. The individuals were interested in trading a stolen bike for methamphetamine, but no transaction took place. Hodak testified that he recognized Keys's distinctive voice on the live audio wire from prior encounters and he could hear Keys explain to the individuals in the truck that he was wearing a facemask because he had active warrants. Hodak also testified that he visually recognized Keys when he exited the building even though Keys was wearing a half ski mask that partially covered the bottom portion of his face.
> Following the purchase, Hjelle returned a small bag of a white, crystal substance to Hodak. Hodak field-tested the substance, which tested positive for methamphetamine. Laboratory testing later

---

[1] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

confirmed the substance was .81 grams of methamphetamine. An arrest warrant was issued for Keys, and in May 2015, he was arrested for delivery of methamphetamine. During a recorded post-arrest interview, Hodak read Keys his *Miranda* rights, explained the charge was related to a controlled buy on December 4, 2014, and indicated that Keys had "options." Hodak advised Keys that he was interested "in moving up the chain" and buying from "other people." Hodak stated, "We know that you middled the deal," and Keys responded affirmatively. Hodak then stated, "We want to move up the ladder" and would talk to the county attorney to "make the charges go away" if Keys assisted with controlled buys.

. . . .

At trial, Officer Hodak and informant Hjelle identified Keys as the individual each saw during the controlled buy. Officer Hodak also identified Keys's voice as a voice on the tape of the controlled buy. Keys testified he was not the individual who sold methamphetamine to Hjelle. He stated he never collected one hundred and thirty dollars from Hjelle nor did he hand anyone a bag of methamphetamine. He also stated, "I have never been a middle man, acted as a middle man, or admitted to being a middle man. And it clearly shows that on the [post-arrest interview] tape." Keys admitted on cross-examination that he had active warrants between late September and December 2014.

2017 WL 1735617, at *1-2.

The State charged Keys with delivery of methamphetamine, a class "C" felony, in violation of Iowa Code section 124.401(1)(c)(6) (2014), and as a habitual offender pursuant to sections 902.8 and 902.9(1)(c). During trial, the State offered and the trial court admitted evidence that Keys stated he "middled" a drug transaction, Keys had active warrants for his arrest, text messages establishing the drug transaction from Keys to Hjelle, and an identification of Keys by voice, all without objection by Keys. *See id.* at *6–8. Keys's counsel did not cross-examine Hjelle about his previous use of counterfeit money or controlled buys but did ask about Hjelle's methamphetamine use in 2014 and asked if Hjelle was a criminal. *See id.* at *7. Keys's counsel also did not object to alleged prosecutorial misconduct based on the State's comments during opening statements and

closing arguments about "drug dealers." *See id.* at \*8–9. Keys introduced testimony through one of his own witnesses, Sammie Watters, that he had warrants, and Keys testified on his own behalf and stated that he had active warrants at the time of the controlled buy. He also admitted on cross-examination that his voice was the one identified in the post-arrest interview. The trial court denied Keys' motions for judgment of acquittal.

The jury found Keys guilty as charged, and Keys admitted his previous convictions, which made the habitual offender enhancement applicable. The trial court overruled Keys's motions in arrest of judgment and for a new trial; it sentenced him to prison. On appeal, we preserved Keys's ineffective-assistance-of-counsel claims for postconviction relief (PCR) and remanded the case to the district court to apply the correct standard on Keys's motion for a new trial. *Keys I*, 2017 WL 1735617, at \*11; *see also id.* at \*6–9 (summarizing Keys's six claims of ineffective assistance). After the trial court denied Keys's motion for a new trial under the correct standard, we affirmed that ruling in *Keys II*. 2018 WL 4382063, at \*2. In doing so, we summarized that the trial court had determined that "(1) the State's witness, a confidential informant, [Hjelle,] was credible; (2) the confidential informant [Hjelle]'s testimony was consistent with and supported by other testimony, and further supported by Keys's recorded statements to law enforcement; and (3) the identification of Keys's voice on an audio recording was credible evidence." *Id.* We also stated that "[t]he district court's conclusions are reasoned and supported by the record." *Id.*

Keys filed two applications for PCR,[2] which were amended and consolidated into the present application. The PCR court held a trial on the application. At trial, Keys offered and the PCR court accepted a deposition of Keys's trial counsel as an exhibit. In the deposition, trial counsel disagreed with PCR counsel that the "middled" statement was a prior bad act because Keys admitted that he middled the transaction on December 4. Trial counsel also stated that Keys's active warrants were not prior bad acts because "warrants for an arrest are simply warrants for an arrest, not prior bad acts." As to testimony about Keys hiding because of the warrants, he added, "You know, just because somebody doesn't want to be arrested doesn't mean they're guilty of something or they're not guilty of something. That means they don't want to be arrested." Regarding the text messages, trial counsel stated that "they were circumstantial evidence that had very little to do with the proof of guilt or innocence." Finally, trial counsel explained that he did not object based on prosecutorial misconduct to the "middling" statements because they were "part of the evidence that came in" and he did not "think it was objectionable as . . . prior bad acts."

In denying Keys's PCR application, the PCR court found that "[t]here is nothing in the record before the Court to show that [trial counsel] could have or should have done anything differently which would have changed the outcome of the criminal prosecution against Keys." Keys appeals.

---

[2] One PCR application, PCCV070526, was filed while Keys's case was on remand to the district court following our decision in *Keys I*. The second, PCCV071399, was filed following our decision affirming Keys's conviction in *Keys II*.

**I. Standard of Review.**

We review ineffective-assistance-of-counsel claims de novo. *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021); *Hernandez Ruiz v. State*, 912 N.W.2d 435, 439 (Iowa 2018) ("[W]e do so . . . because such claims are constitutional in nature.").

**II. Analysis.**

Now on appeal from the denial of his consolidated PCR application, Keys raises several issues over evidentiary matters. He argues trial counsel should have (1) objected to admission of an audio recording of him admitting he "middled" a drug transaction, (2) objected to admission of testimony on his active warrants, (3) cross-examined Hjelle about his previous use of counterfeit money and controlled buys, (4) objected to admission of text messages establishing the drug transaction as between Hjelle and him, (5) objected to Hjelle identifying him by voice, and (6) objected to prosecutorial misconduct. He claims that the cumulative effect of trial counsel's errors amounts to *Strickland* prejudice and requires his conviction to be vacated.

### A. Ineffective Assistance Claim.

"[T]o succeed on an ineffective-assistance claim, a PCR applicant must establish that counsel breached a duty and prejudice resulted, and the claim fails if either element is lacking." *Lusk v. State*, No. 18-1125, 2019 WL 1953461, at *1 (Iowa Ct. App. May 1, 2019); *see Strickland*, 466 U.S. at 687. "Both elements must be prove[d] by a preponderance of the evidence." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). Regarding the duty prong, counsel does not have a duty to raise an issue that has no merit. *State v. Schaer*, 757 N.W.2d 630, 637 (Iowa

2008); *State v. Bearse*, 748 N.W.2d 211, 215 (Iowa 2008) ("Counsel cannot fail to perform an essential duty by merely failing to make a meritless objection."). Furthermore, "where [an applicant] alleges counsel's failure to pursue a particular course breached an essential duty, there is no such duty when the suggested course would have been meritless." *State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015).

Regarding the prejudice prong, "an applicant must meet 'the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *Ledezma*, 626 N.W.2d at 143–44 (quoting *Strickland*, 466 U.S. at 696). In other words, the applicant must show "the reasonable probability of a different verdict, or that the fact finder would have possessed reasonable doubt." *Id.* at 144. This showing must be "sufficient to undermine confidence in the outcome." *Bowman v. State*, 710 N.W.2d 200, 206 (Iowa 2006) (citation omitted). We address each of the areas of Keys's challenge separately.

*1. "Middling."* The statement that Keys "middled" a drug transaction is a quote from Keys speaking with law enforcement following his arrest. We summarized the exchange in *Keys I*:

> During the beginning of the post-arrest conversation, before the promise of leniency, the officer read Keys his *Miranda* rights, informed him they were discussing his case, and confirmed the charge of delivery of methamphetamine from December 4, 2014. While discussing the charged offense and the controlled buy, Keys stated, "If y'all got me y'all got me. But I'm pretty sure y'all know, chances are, if that's the case [he] used me as a middle man." The officer then referenced the specific controlled buy, which led to the charged crime, "I'll be honest with you, we know that you middled the deal." Keys responded affirmatively and explained, "[People] call me and I can get it for you, that's it."

2017 WL 1735617, at *7.  Given this exchange, Keys's statements are admissible by the State as a statement of a party opponent.  *See* Iowa R. Evid. 5.801(d)(2)(A). Trial counsel attempted to keep this information from the jury by moving to suppress it, but the court allowed these portions of the taped interview to be played.

But Keys advocates that the issue is not that he said he was the middle man as to the December 4 transaction, but that his trial counsel allowed statements from the prosecutor that suggested Keys had an ongoing practice of "middling," which in his view raised improper bad acts inferences.  *See* Iowa R. Evid. 5.404(b).[3]  He points to several instances where he contends his trial counsel should have objected.  In the State's opening statement, the prosecutor said:

> "Now, you're going to later hear in that interview that happens on May 28, 2015, when he was arrested, that defendant says that he was middling.  Now, middling, what does that mean?  You're going to hear testimony that—from Investigator Hodak it's kind of like when you have a broker who puts a buyer and seller together.  You're the middle man.  You put a seller of methamphetamine together with a buyer, but that's still—you're still dealing the methamphetamine.
> So he even readily admits that he's able to hook people up— in his interview—with methamphetamine.

This statement goes directly to the specific sale of drugs involved in the case, and we see no basis for counsel to have lodged a bad acts objection, so it would not

---

[3] Rule 5.404(b)(1)-(2) provides:
> b. *Crimes, wrongs, or other acts*.
> (1) *Prohibited use*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in in accordance with the character.
> (2) *Permitted uses*. This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

have been successful. We find the same situation involving statements made in closing statements, where the prosecutor urged:

> Well, let's do that. Let's cut the bull crap. He was dealing. He's a dealer. He was middling that day. That's exactly what he testified—or excuse me—he interviewed about. It's clear on that tape.
> He was the one that actually used the words "middle man." He said: Let's cut the bull crap. If there's a user, there's a mother-f-ing middle man.

So again, these statements relate to the incident and not other bad acts.

Finally, testimony describing what "middling" meant appeared in the record, but as the PCR court noted, there were no other specific drug transactions mentioned as to Keys that pointed to possible bad acts by him. And the statements paraphrasing this "middling" all refer to Keys's actions on December 4, for which he was on trial, so they do not fall under a prior-bad-acts analysis. Thus, a rule 5.404(b) objection would have been meritless, and Keys did not show trial counsel breached a duty regarding this issue.

*2. Active Warrants.* Keys counts twenty-five times the State emphasized that Keys had warrants out for his arrest; he asserts the State's focus on the outstanding warrants and that he was hiding from law enforcement because of them is an effort to show his bad acts. He argues trial counsel should have objected to this evidence. Detective Hodak testified that Keys was wearing a face mask and based on the recording "he just said he had it on because he had a warrant." Deputy Hodak and another member of law enforcement that testified at trial, Cameron Manson, confirmed that Keys had an active warrant at the time. Noting that identity of the drug dealer was a prime issue, the State contends it relied on admission of this evidence of Keys's active warrants as proof of Keys's

identity because the dealer on December 4 also mentioned he had active warrants, and proof of identity is an exception to the prohibition on prior-bad-acts evidence. *See* Iowa R. Evid. 5.404(b)(2) ("This evidence may be admissible for another purpose such as proving . . . identity . . . ."). The evidence also explained why Keys was wearing the half ski mask that day. Although Keys insists that evidence of the warrants was evidence of his propensity for criminal behavior and was prejudicial to him, a warrant is not the same as a conviction. *Cf. State v. Gates*, No. 21-0797, 2023 WL 7383749, at *3 (Iowa Ct. App. Nov. 8, 2023) ("[A] charge is not a conviction."); *State v. Wilson*, 406 N.W.2d 442, 448 (Iowa 1987) ("A criminal defendant is presumed innocent until his guilt is established beyond a reasonable doubt."). Likewise, the State did not identify what particular crimes were allegedly involved with the warrants issued.

Lastly, evidence of Keys's active warrants was also admitted through testimony by Keys's witness, Watters, and Keys's own testimony so—although we do not find any error here—the alleged error would have been harmless, and thus not prejudicial to Keys. *See Strickland*, 466 U.S. at 687 (requiring both deficient performance and prejudice); Iowa R. Evid. 5.103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."); *State v. Krogmann*, 998 N.W2d 141, 155 (Iowa 2023) (discussing harmless error analysis).

**3. Text Messages.** Keys argues the text messages were offered for the truth that Hjelle was headed to meet with him to execute a drug sale and his trial counsel should have objected on authentication and hearsay grounds. Keys emphasizes that even in the text of the message the signature of the author was

"Scotty P," not Keys. The State contends both Hjelle and Deputy Hodak authenticated the text messages as coming from Keys and that the text messages from Keys to Hjelle fall under the same exception to the rule against hearsay as the "middled" statement—admission of a party opponent. *See* Iowa R. Evid. 5.801(d)(2)(A). "The authentication burden is not high, it need only allow a reasonable jury to find the evidence is authentic." *State v. Groat*, No. 19-1809, 2021 WL 1016593, at *5 (Iowa Ct. App. Mar. 17, 2021).

In the text messages, the person entered as "Keys" as a contact in Hjelle's phone responds "K" three times, then writes "Yea hurry" and asks, "Where u at." The sender signed the messages "YA BOY SCOTTY P." Deputy Hodak testified that he recognized the number and that it was listed in the law enforcement record management system as associated with Keys. He also testified that he believed that "YA BOY SCOTTY P" was a reference to a funny character in the movie *We're the Millers*. Hjelle testified that he assigned the name Keys to the phone number in his phone. With this background related to the text messages, we conclude there was proper authentication through testimony from Hjelle that he had contacted Keys at this number, saved the number into his phone as Keys's number, and that the number was "associated with" Keys in existing law enforcement records. *See* Iowa R. Evid. 5.901(a). Because any objection based on hearsay or authentication grounds would not have been successful, counsel breached no duty by failing to raise the meritless issues.

*4. Voice Identification.* Here, Keys argues his trial counsel should have objected to testimony identifying his voice. But Detective Hodak's identification of Keys' voice was admissible as his opinion "based on hearing the voice at any time

under circumstances that connect it with the alleged speaker." Iowa R. Evid. 5.901(b)(5) (permitting authentication of a voice where supported by "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker"). Detective Hodak was familiar with Keys from prior interactions with him including Keys's post-arrest interview. Specifically, Deputy Hodak testified that he knew that Keys was the voice on the recording of the transaction. In addition, Deputy Hodak testified that he interviewed Keys, and the State offered and the court admitted a recording of that interview. From that interview, Deputy Hodak said that he was also familiar with Keys's voice. In addition, the jury heard the recording of the controlled buy and the interviews of Keys and was able to compare the voices, and Keys admitted on cross-examination that it was his voice in the recording of the post-arrest interview. Because any objection would have been meritless, Keys again cannot meet his burden to show a breach of duty.

*5. Impeachment of Hjelle.* Similarly, not impeaching Hjelle based on his involvement in other controlled buys and alleged charge for use of counterfeit money was in line with the limine ruling and trial strategy. For background, the State moved in limine to prevent the admission of "witnesses or questioning of . . . Hjelle about counterfeit money or any other prior bad act." The motion also requested a prohibition on "questioning of . . . Hjelle about other controlled buys conducted by [him] or the number of such buys." When the court asked Keys if he planned to impeach Hjelle based on the use of counterfeit money allegation, Keys responded, "I don't know about the counterfeit money. I'm probably not going to

ask him about that." The trial court excluded testimony about other controlled buys.

Here, Keys does not argue what specific information he would have gained about other buys and how that would have changed the outcome of the case. As for the counterfeiting charge, the trial court ruled on the State's motion in limine and, because there was no charge or conviction related to the incident, would not allow the inquiry. Although the trial court said, "If you do go into the counterfeit money, alert me to that so we can discuss further," the PCR court confirmed in the proceeding before it that there was "no evidence whatsoever that Hjelle had ever been arrested or charged [for any counterfeiting crime]." Keys has not shown a breach of duty related to the impeachment claim.

What's more, trial counsel did impeach Hjelle "with prior inconsistent statements made under oath, testimony about a prior felony conviction, and testimony about ulterior motives to implicate the defendant in order to fulfill an agreement with the State by which he had a driving while barred charge dismissed." *Keys I*, 2017 WL 1735617, at \*8. In addition, trial counsel asked about Hjelle's substance-use history. Thus, failing to add an additional impeachment method was neither prejudicial nor a breach of duty.

**6. Prosecutorial Misconduct.** Lastly, regarding prosecutorial misconduct, Keys needed to prove that the prosecutor perpetrated (1) misconduct that (2) resulted in prejudice to such an extent he was denied a fair trial. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). Specifically, Keys points to the opening statements and closing arguments made by the State. The State said in opening, "You're dealing with drug dealers. You're dealing with people that are

not, in essence, the most innocent people, I guess, is a way to put it. These people can be dangerous." During closing, the State also asked the jury, "Does it look— Does he sound like a drug dealer, does he look like a drug dealer, does the case look like—Excuse me. Does the case look like a drug dealer case; and does it look like the evidence shows that he, in fact, delivered methamphetamine?" Here, the prosecutor's references to a "drug dealer" and "drug deal case" does not rise to the level of deprivation of a fair trial. *See State v. Coleman*, 907 N.W.2d 124, 140–41 (Iowa 2018) (requiring more than isolated statements). "Instead, misconduct occurs when the prosecutor seeks this end through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury." *State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006). This was a "drug deal case," and referring to it as such does not amount to prosecutorial misconduct requiring objection or amount to a breach of trial counsel's duty.

### B. Cumulative Error Claim.

Keys also claims that the cumulative effect of the errors discussed above should lead to his conviction being vacated. When analyzing the prejudicial effect of several allegations of ineffective assistance of counsel, we "look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (referencing *Strickland*, 466 U.S. at 698); *see also Schrier v. State*, 347 N.W.2d 657, 668 (Iowa 1984) (affirming the denial of PCR because after reviewing the effect of the cumulative errors, "it [had] not been established that petitioner was denied a fair trial"). But as discussed above, we find that the alleged errors on the part of trial counsel were not breaches of duty. Without any errors of

counsel, there can be no cumulative prejudice that amounts to *Strickland* prejudice. *See Clay*, 824 N.W.2d at 501–02 ("[T]he court can . . . dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice."); *accord Armstrong v. State*, No. 13-1985, 2015 WL 4642164, at *4 (Iowa Ct. App. Aug. 5, 2015) ("While we agree that consideration of cumulative prejudice is the proper analysis, because we have already concluded that none of [the applicant's] allegations amounted to failure to perform an essential duty, we need not consider whether [the applicant] was prejudiced."). For these reasons, we find that Keys has also failed to establish ineffective assistance requiring that we vacate his conviction. We affirm the district court's denial of his PCR application.

**AFFIRMED.**